CLIFTON STANLEY SHORT, Jr., Plaintiff Below, Appellant, v. THE NEWS–JOURNAL COMPANY, a corporation of the State of Delaware, Defendant Below, Appellee.

(*July* 30, 1965)

WOLCOTT, C. J., and CAREY and HERRMANN, JJ., sitting.

*James H. Hughes, III,* for plaintiff below, appellant.

*Louis J. Finger,* of Richards, Layton & Finger, for defendant below, appellee.

Supreme Court of the State of Delaware. No. 27, 1965.

HERRMANN, Justice.

This is a libel action. The ultimate question on the appeal is whether the newspaper publication here involved was privileged.

I.

The facts are uncontroverted:

On January 11, 1963, Eugene Knoblauch, a reporter for the defendant, The News-Journal Company, made a routine check of the Wilmington office of the District Director of Internal Revenue Service (hereinafter "Director"). Knoblauch asked the Director whether he had any news for press release. In the Director's presence and with his consent, the Chief of the Delinquent Accounts and Returns Branch of the office related to Knoblauch the details of a seizure for taxes, just made, of the property of a man whose name he gave as C. Stanley Short, Jr.

On the basis of Knoblauch's report, the defendant published a news story in the Wilmington Morning News of January 12, 1963 which was a correct summary of the information furnished to Knoblauch; and an abbreviated version of the same story appeared in the Evening Journal of the same date.

Both news stories contained the erroneous information, as furnished to Knoblauch, that the name of the person whose property was seized was C. Stanley Short, Jr. In fact the name of the taxable involved was C. Stanley Short, Sr., otherwise the news stories were

accurate. The defendant published retractions immediately upon learning of the mistake.

C. Stanley Short, Jr. brought this libel action against the defendant newspaper publishing company only. Plaintiff contends that the issuance of the news release was not within the scope of the duties of the Director; that, therefore, the release was not privileged; and, under the common law maxim that "tale bearers are as bad as tale makers", that the defendant stands liable to the plaintiff for publication of the false and defamatory statement. The defendant raised the defense of privilege. The plaintiff conceded the absence of malice and of abuse of privilege. The Superior Court held that the publication was privileged [205 A. 2d 6] and granted summary judgment in favor of the defendant. This appeal followed.

## II.

This court has not been called upon heretofore to consider the precise questions here involved.

The law of defamation embodies the public policy that, generally, individuals must be protected so as to enjoy their good reputations unimpaired by defamatory statements. The general rule is that the publisher and republisher of defamatory matter are strictly accountable and liable in damages to the person defamed, and neither good faith nor honest mistake constitutes a defense, serving only to mitigate damages. E. g., *Star Publishing Co. v. Donahoe,* Del., 58 A. 513, 65 L.R.A. 980 (1904).

There is, however, a counter public policy requiring that, in certain situations, a paramount public interest permits speaking and writing freely and without restraint by the possibility of defamation action. In such situations, the law recognizes certain privileges and immunities from liability. The defense of privilege in defamation cases "rests upon the * * * idea, that conduct which otherwise would be actionable is to escape liability because the defendant is acting in furtherance of some interest of social importance, which is entitled to

protection even at the expense of uncompensated harm to the plaintiff's reputation." Prosser on Torts (3d Ed.) p. 796. The privilege may be absolute or conditional. An absolute privilege affords a complete defense irrespective of accuracy or malice; a conditional privilege affords protection only in the absence of malice. *Klein v. Sunbeam Corporation,* 8 Terry 526, 94 A. 2d 385 (1952); *Pierce v. Burns,* Del., 185 A. 2d 477 (1962).

We now address ourselves to the specific questions of privilege presented, first as to the Director and his subordinate, and secondly as to the defendant publishing company.

### III.

Since the Director and his colleague were federal officials, the nature of their privilege is governed by federal case law. This was settled in *Howard v. Lyons,* 360 U.S. 593, 79 S. Ct. 1331, 3 L. Ed. 2d 1454 (1959); compare *Carr v. Watkins,* 227 Md. 578, 177 A. 2d 841, 845 (1962).

The federal rule governing the privilege of officials of the executive branch of government was recently stated in *Barr v. Matteo,* 360 U. S. 564, 79 S. Ct. 1335, 3 L. Ed. 2d 93 (1959). Prior to that case,[1] the United States Supreme Court had held in *Yaselli v. Goff* (2 Cir. 1926) 12 F. 2d 396, aff'd per curiam 275 U. S. 503, 48 S. Ct. 155, 72 L. Ed. 395 (1927), that the immunity of the absolute privilege extended to a Special Assistant to the Attorney General of the United States; and in *Spalding v. Vilas,* 161 U. S. 483, 16 S. Ct. 631 (1905), it

---

[1] The legislative privilege under English law dates back to the Fourteenth Century. It was carried forward in the Constitution of the United States (Art. 1, Sec. 6) and the Constitutions of most States (E.G., Del. Const. Art. 2, Sec. 13 *Del. C. Ann.*). The judicial privilege existed in England as early as 1608. However, the earliest recognition of a civil government executive privilege was the 1895 English case of *Chatterton v. Secretary of State for India,* 2 Q.B. 189. *Spalding v. Vilas,* 161 U.S. 483, 16 S. Ct. 631, 40 L. Ed. 780, the leading American case dealing with the executive privilege, was decided by the United States Supreme Court in 1905. [See dissenting opinion of Chief Justice Warren in *Barr v. Matteo,* 360 U.S. 564, 79 S. Ct. 1335, 1343-1345; *Norton v. McShane* (5 Cir., 1964) 332 F. 2d 855, 857-860 (1964); Anno. 132 A.L.R. 1340].

held that the absolute privilege protected the Postmaster General of the United States. In *Barr v. Matteo*, however, the executive privilege was widely extended. There, following a congressional challenge to the integrity of the operations of the Office of Rent Stabilization, the Acting Director of that agency issued a press release in which he gave reasons why he intended to suspend two other officers of the agency. These officers thereafter brought a libel suit against the Acting Director based upon the statements contained in the release; and the Acting Director pleaded privilege. The majority of the Court held that the principle of the Vilas case should not be limited to executive officials of cabinet rank and that the absolute privilege should be extended to the news release issued by the Acting Director. Thus, the cloak of absolute privilege was extended to news releases of federal executive officials of lower echelons, provided that such releases are "within the outer perimeter" of the official's "line of duty" (79 S. Ct. 1341).[2]

We are not called upon to agree or to disagree with the holding of *Barr v. Matteo*. As noted above, the status of the privilege of the Director and his subordinate is controlled by the federal rule in any event. We expressly reserve until another day the question of the extent to which members of the executive branch of our State government are privileged.[3]

Thus, the only question before us, in ascertaining the privilege status of the Director and his colleague, is whether the news release in the instant case was within the "outer perimeter" of their "line of

---

[2] The ruling in the Barr case was a 5 to 4 decision in which the dissenters thought that a qualified privilege, conditioning immunity upon absence of malice, was sufficient protection for lesser executive officials and more adequate protection for the citizen who may be unduly exposed to being victimized by a malicious office holder. The principal opinion in the Barr case has been criticized by writers in this field of the law as affording too much protection for the public official and too little protection for the private citizen. See Handler and Klein, "The Defense of Privilege in Defamation Suits Against Government Executive Officials", 74 Harv. L. Rev. 44 (1960); Becht, "The Absolute Privilege of the Executive in Defamation", 15 Vand. L. Rev. 1127 (1962); Gray, "Private Wrongs of Public Servants", 47 Cal. L. Rev. 303 (1959); Note, 48 Cornell L. Q. 199 (1962).

[3] Several states have declined to follow the federal rule on the ground that an

duty". We think it was.

It appears that the Director was explicitly charged by the Commissioner of Internal Revenue with the responsibility "to release enforcement news" in implementing the general policy of the Internal Revenue Service "to conduct a continuous information program in order to enhance public compliance with tax laws and regulations, augment the activities of enforcement programs and promote respect for and confidence in the Service." In line with this policy, and "in order to provide the strongest possible deterrent to violation of the Internal Revenue laws" the District Director was "encouraged to co-operate with representatives of news media in the publication of enforcement news which is a matter of record."

Thus, it was clearly within the scope of the specified duties of the Director to release to news media information of tax seizures and sales as a deterrent to other taxables and as part of the well recognized enforcement program of the Internal Revenue Service. Manifestly, the release of information in the subject case, made by the Head of Branch in the Director's presence and with his consent, falls squarely within such enforcement program.

We hold, therefore, that the action of the Director and his associate, in issuing the news release, was within "the outer perimeter" of their "line of duty." Under the Barr case, their action in so doing was privileged. Compare *Babylon Milk & Cream Co., Inc. v. Rosenbush*

---

immunity conditioned upon the absence of malice is sufficient protection for lesser officials of the executive branch of government. In *Carr v. Watkins* supra, for example, the Court of Appeals of Maryland has held recently that a federal police officer enjoyed an absolute privilege by virtue of *Barr v. Matteo*, but that county police officers in the same case were covered only by a conditional privilege. *Cf. Klein v. Sunbeam Corporation*, supra, where, in a dictum, this court recognized only a legislative and judicial absolute privilege. Our courts have previously considered the judicial privilege. E.g., *Todd v. Every Evening Printing Co.*, Del. Super., 62 A. 1089, (1906); *Gordon v. News Journal Co.*, 6 W. W. Harr. 396, 176 A. 657 (1935); but we find no Delaware precedent dealing with the executive privilege. Compare Part III, Becht, "The Absolute Privilege of the Executive in Defamation", 15 Vand. L. Rev. 1127, 1148; Part 3, Gray "Private Wrongs of Public Servants", 47 Cal. L. Rev. 303, 342.

(E.D.N.Y. 1964) 233 F. Supp. 735.

## IV.

■ The law recognizes a privilege in favor of a newspaper to report the governmental acts of executive officials of government. We are of the opinion that the news release of the Director and his associate in the instant case was in the category of governmental acts covered by such privilege.

This privilege is based upon the theory that it is *pro bono publico* for information to be widely circulated regarding the governmental activities of public officials. As stated in Restatement of Torts, p. 240:

"In order that such information may be freely given, it is necessary to afford protection against liability for misinformation given in an honest and reasonable effort to protect or advance the interest in question. Were such protection not given, true information which should be given or received would not be communicated through fear of the persons capable of giving it that they would be held liable in an action of defamation unless they could meet the heavy burden of satisfying a jury that their statements were true."

■ This is a conditional privilege, however, rather than absolute. If the newspaper account is fair, accurate and complete, and not published for the purpose of harming the person involved, it is privileged and no responsibility attaches, even though information contained therein is false. The rule is succinctly stated at Restatement of Torts, Sec. 611:

"The publication of a report of * * * proceedings of * * * an executive officer of the United States, a State or Territory thereof * * * is privileged, although it contains matter which is false and defamatory, if it is (a) accurate and complete or a fair abridgement of such proceedings, and (b) not made solely for the purpose of causing harm to the person defamed."

See also Prosser on Torts (3d Ed.) pp. 816–819; 1 Harper and James, "The Law of Torts", Sec. 5.24; "Privilege to Republish Defamation", 64 Columbia L. Rev. 1102 (1964); *Sciandra v. Lynett,* 409 Pa. 595, 187 A. 2d 586 (1963); *Coleman v. Newark Morning Ledger Co.,* 29 N. J. 357, 149 A. 2d 193 (1959).

■ Adopting and applying these concepts, and recognizing the conceded facts that the defendant's publication of the news release of the Director and his subordinate was fair, accurate and complete, and not made to harm the plaintiff, we conclude, in agreement with the Superior Court, that the publication by the defendant was privileged. Compare *Star Publishing Co. v. Donahoe,* supra; *Todd v. Every Evening Printing Co.,* supra.

In the absence of any charge of malice or abuse of privilege, the Superior Court correctly granted summary judgment in favor of the defendant. The judgment below is affirmed.