Margo KANAGA, M.D., Plaintiff
Below, Appellant,

v.

GANNETT CO., INC. t/a The News Jour-
nal Company, Jane Harriman and Pame-
la Kane, Defendants Below, Appellees.

No. 466, 1995.

Supreme Court of Delaware.

Submitted: Sept. 10, 1996.
Decided: Nov. 27, 1996.
Revised: Dec. 23, 1996.
Rehearing Denied: Dec. 23, 1996.

James S. Green (argued), of Duane, Morris & Heckscher, and Lynn Thomas Kanaga, Wilmington, for Appellant.

Mason E. Turner, Jr. of Prickett, Jones, Elliott, Kristol & Schnee, Wilmington, for Appellee Gannett Co., Inc. t/a The News Journal Company.

William J. Cattie (argued), of Heckler & Cattie, Wilmington, for Appellee Pamela Kane.

Robert C. Bernius (argued), of Nixon, Hargrave, Devans & Doyle, Washington, DC, for Appellee Jane Harriman.

Before VEASEY, C.J., WALSH and HOLLAND, JJ.

VEASEY, Chief Justice:

In this appeal we conclude that one who publishes defamatory material about a non-public figure does not necessarily enjoy First Amendment protected speech status as a matter of law when that material is expressed in terms of an opinion. Here, a physician claims to have been libeled by a patient-defendant who presented defamatory material to the media-defendants who published the material. The defendants claim that the material was opinion and, as such, is protected speech. We hold that summary judgment was improperly granted in favor of defendants where the defamatory material, though expressed as an opinion, implied the existence of facts which a jury could find to be false. Because of the existence of disputed issues of material fact, we reverse the grant of summary judgment and remand for trial.

### Facts

Margo Kanaga, M.D., is an obstetrician-gynecologist who has been practicing in the Wilmington area since 1978. Pamela Kane is a 45-year-old former patient of Dr. Kanaga. Jane Harriman is a reporter who writes health and medicine articles for *The News Journal,* a Gannett publication.

On April 2, 1992, Ms. Kane visited Dr. Kanaga's office because of severe menstrual bleeding. Dr. Kanaga informed Ms. Kane that the bleeding was due to a protruding uterine fibroid tumor blocking her cervix. Due to the tumor's position, Dr. Kanaga was unable to determine the size of the tumor's pedicle (the base of a tumor). For that reason, Dr. Kanaga ruled out a myomectomy

(a procedure whereby the tumor is removed by twisting its pedicle with surgical forceps). Dr. Kanaga recommended that Ms. Kane undergo a hysterectomy, but she also suggested that Ms. Kane obtain a second opinion.

Before Ms. Kane could obtain a second opinion, the bleeding worsened considerably, and she went to the emergency room of St. Francis Hospital. The tumor had changed positions, making its pedicle visible using a speculum (a surgical instrument used for rendering internal organs accessible to observation). Dr. Ronaldo Domingo examined her at the emergency room and discovered that the tumor's pedicle was small enough for him to perform a myomectomy. Dr. Domingo testified that he would not have attempted this procedure if he had not been operating under emergency conditions or if the tumor's pedicle had not been so readily detachable.

Immediately after Dr. Domingo removed Ms. Kane's tumor, Ms. Kane asked Dr. Domingo if she needed to have a hysterectomy. Dr. Domingo responded that, although a hysterectomy is an acceptable form of treatment for a protruding fibroid tumor, Ms. Kane did not need a hysterectomy at that time because he was able to remove the tumor. He also stated he could not be certain she would not need a hysterectomy in the future.

Because she had been treated successfully by Dr. Domingo, Ms. Kane felt that Dr. Kanaga had recommended an unnecessary and radical form of treatment to earn a larger fee than the myomectomy would have earned her. There is no evidence on this summary judgment record that Ms. Kane had or stated a factual basis for her opinion.

Ms. Kane then embarked upon a course of conduct designed to warn, through the news media, other women about doctors prescribing unnecessary procedures for their patients solely for monetary gain. Without telling Dr. Kanaga that Dr. Domingo had already removed the tumor, Ms. Kane called Dr. Kanaga to set up an appointment for the hysterectomy. Ms. Kane taped the telephone conversation without Dr. Kanaga's knowledge and misled Dr. Kanaga into believing Ms. Kane had obtained a second opinion concurring with Dr. Kanaga's hysterectomy recommendation. Ms. Kane then filed a formal complaint with the New Castle County Medical Society alleging that Dr. Kanaga breached the proper standard of care by recommending unnecessary surgery for financial gain. The Medical Society ultimately exonerated Dr. Kanaga, but not before publication in the *News Journal* of the articles which are the subject of this libel action.

Before the Medical Society acted on her complaint, Ms. Kane contacted the *News Journal* and told her story to the reporter, Ms. Harriman. Ms. Kane shared with Ms. Harriman the complaint filed with the Medical Society and the surreptitiously taped telephone conversation between Ms. Kane and Dr. Kanaga.

There was an internal discussion among the *News Journal* staff on the issue of whether or not an article should be published before the Medical Society acted on Ms. Kane's complaint.[1] Nevertheless, on Sunday, July 5, 1992, before the Medical Society

---

1. Ms. Harriman testified on deposition:

   Q. Did you give consideration to waiting until the Medical Society rendered an opinion or decision on Mrs. Kane's complaint before writing an article?
   A. Yes.
   Q. But you did not wait; is that fair?
   A. Yes. I did not wait.
   Q. Why not?
   A. Mr. McIver [Ms. Harriman's editorial supervisor] told me not to.
   Q. Did you have a discussion with Mr. McIver as to why he wanted you to write it before the Medical Society rendered a decision?

   * * * * * *
   A. I think that I went and said, "Why don't we wait until after the New Castle County Medical Society makes a decision?" And he—I don't remember what he said. But obviously, it was no, because I wrote it. Appendix to Appellant's Opening Brief at A–127–128, *Kanaga v. Gannett*, Del.Super., C.A. Nos. 92C–12–182–SCD, 94C–09–19–SCD (consolidated), slip op., 1995 WL 716938, Herlihy, J. (Oct. 20, 1995).

had acted on the complaint, the *News Journal* published a news article authored by Ms. Harriman under the headline: "Patient Feels Betrayed." The subheading read, "Says proposed hysterectomy wasn't needed." The article quotes Ms. Kane as saying, "I can only conclude that Dr. Kanaga ... chose the treatment plan that was most profitable for her with no concern for me." The article does not report any facts to support Ms. Kane's opinion that Dr. Kanaga's motive in recommending a hysterectomy was monetary gain without concern for the patient. The full text of the article is reproduced in the Addendum to this Opinion and additional excerpts are referred to later in this Opinion.

The Medical Society ultimately exonerated Dr. Kanaga, whereupon Ms. Harriman published a second article on September 2, 1992, reporting the Society's findings. A copy of that article is also reproduced in the Addendum.

On December 18, 1992 and September 2, 1994, Dr. Kanaga filed two separate libel suits against Ms. Kane, Ms. Harriman and Gannett.[2] The Superior Court granted summary judgment in favor of the defendants, dismissing both actions. The court ruled that the statement in the first article about Dr. Kanaga recommending a hysterectomy for financial gain was defamatory. The Superior Court further ruled that, since all the relevant facts Ms. Kane used to arrive at her opinion were available to the reader, the statement was protected by the First Amendment to the United States Constitution[3] as an expression of Ms. Kane's "pure opinion" under this Court's opinion in *Riley v. Moyed*.[4]

### Standard and Scope of Review

Since this case raises constitutional issues, this Court "has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'"[5] We review *de novo* the grant of summary judgment on the facts and the law to determine if disputed issues of material facts exist, thus precluding summary judgment. Conversely, we must determine whether or not the facts of record entitle the movant to judgment as a matter of law, viewing those facts in the light most favorable to the nonmoving party, which for this purpose is the plaintiff.[6]

### Constitutional Analysis

■ We hold that the First Amendment to the United States Constitution does not, as a matter of law, protect from exposure to damages for libel the defendants' publication of the July 5, 1992 article. We also hold that the September 2, 1992 article is not actionable. Although we conclude that the United States Constitution is essentially implicated, we conclude that the Delaware Constitution is also implicated.

There are two applicable provisions of the Delaware Bill of Rights set forth in Article I

---

**2.** The suit filed December 18, 1992, Civil Action No. 92C–12–182–SCD, involves the *News Journal* article dated July 5, 1992. The suit filed September 2, 1994, Civil Action No. 94C–09–19–SCD, involves the *News Journal* article dated September 2, 1992.

**3.** The First Amendment to the United States Constitution provides:

Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or abridging the freedom of speech, or of the press; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances. U.S. Const., amend. I.

**4.** *Riley v. Moyed*, Del.Supr., 529 A.2d 248, 251 (1987).

**5.** *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 17, 110 S.Ct. 2695, 2704–05, 111 L.Ed.2d 1 (1990) (citing *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S.Ct. 1949, 1959, 80 L.Ed.2d 502 (1984) (quoting *New York Times v. Sullivan*, 376 U.S. 254, 284–86, 84 S.Ct. 710, 728–29, 11 L.Ed.2d 686 (1964))).

**6.** *Arnold v. Society for Sav. Bancorp, Inc.*, Del. Supr., 678 A.2d 533, 535 (1996); *Williams v. Geier*, Del.Supr., 671 A.2d 1368, 1375 (1996). In the case *sub judice*, plaintiffs and defendants filed cross-motions for summary judgment. Nevertheless, we do not consider that plaintiff has thereby waived the contention that there are triable issues of fact. *Empire of America Relocation Services, Inc. v. Commercial Credit Co.*, Del. Supr., 551 A.2d 433, 435 (1988).

of the 1897 Constitution. The first is Section 5.[7] The second is Section 9.[8]

Section 5 establishes generally the right of freedom of expression for citizens, provided that they are "responsible for the abuse of that liberty." That section specially provides for a free press "to examine the official conduct of men acting in a public capacity," an issue not involved in this case. That section also provides for truth as a defense and for jury trials "as in other cases" for "all indictments for libels."

Section 9 is a version of the "open courts" or "remedies" clauses appearing in at least thirty-seven state constitutions.[9] Section 9, in our view, establishes a strong state constitutional basis for remedies to recompense damage to one's reputation. In our view, the protection afforded to reputations by the Delaware Constitution weighs heavily in the balance of the analysis involving constitutionally protected speech.[10]

In *Milkovich v. Lorain Journal Co.,* the United States Supreme Court held that the First Amendment does not provide a "whole-sale defamation exemption for anything that might be labeled 'opinion.'"[11] An "opinion may often imply an assertion of objective fact" and, if the implied fact may be found to be false, the trier of fact may find the plaintiff to have been libeled.[12]

The hypothetical case used by the Supreme Court in *Milkovich* to illustrate this principle is apt. If one says, and a media defendant publishes, the statement, "In my opinion Jones is a liar," there may be implied a false assertion of fact. This statement implies facts which could lead to the conclusion that Jones told untruths. The Supreme Court stated the essence of its analysis in a case where the media defendant implied that a high school wrestling coach lied under oath in a judicial proceeding probing into an altercation at a wrestling match:

> Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in

7. Article I, Section 5, provides:

§ 5. **Freedom of press; evidence ·in libel prosecutions; jury questions.**

Section 5. The press shall be free to every citizen who undertakes to examine the official conduct of men acting in a public capacity; and any citizen may print on any subject, being *responsible* for the *abuse* of that liberty. In prosecutions for publications, investigating the proceedings of officers, or where the matter published is proper for public information, the truth thereof may be given in evidence; and in all indictments for libels the jury may determine the facts and the law, as in other cases. DEL. CONST. art. I, § 5 (emphasis added).

8. Article I, Section 9, of the Delaware Constitution, provides:

§ 9. **Courts shall be open; remedy for injury; suits against State.**

Section 9. All courts shall be open; and every man for an injury done him in his *reputation,* person, movable or immovable possessions, shall have remedy by the due course of law, and justice administered according to the very right of the cause and the law of the land, without sale, denial, or unreasonable delay or expense. Suits may be brought against the State, according to such regulations as shall be made by law. DEL. CONST. art. I, § 9 (emphasis added).

9. JENNIFER FRIESEN, STATE CONSTITUTIONAL LAW, LITIGATING INDIVIDUAL RIGHTS, CLAIMS AND DEFENSES § 6-2(a), at 347 & n. 11 (2d ed. 1996). *See also* David Schuman, *The Right to a Remedy,* 65 Temp.L.Rev. 1197 (1992). Those clauses originated from Sir Edward Coke's restatement of the Magna Charta, Chapter 40. Jonathan M. Hoffman, *By the Course of the Law: The Origins of the Open Courts Clause of State Constitutions,* 74 Or.L.Rev. 1279, 1284 (1995). Such a clause appeared in America for the first time in the 1776 Delaware Declaration of Rights. *Id.*

10. *See also Doe v. Poritz,* 142 N.J. 1, 662 A.2d 367, 419 (1995) (in upholding the constitutionality of "Megan's Law" relating to notification of communities regarding released sex offenders, the Court noted that a New Jersey constitutional provision similar to Article I, Section 9, of the Delaware Constitution, establishes a "protectible interest in reputation without requiring other tangible loss"); *Sprague v. Walter,* 518 Pa. 425, 543 A.2d 1078, 1084–85 (1988) (citing, in a defamation case implicating the relationship between the federal and state constitutional provisions relating to free speech and reputation, Article I, Section 11, of the Pennsylvania Constitution, which declares that: "[E]very man for an injury done him in his lands, goods, person or reputation shall have remedy by due course of law").

11. *Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2705–06.

12. *Id.* at 18–19, 110 S.Ct. at 2705–06.

terms of opinion does not dispel these implications; and the statement, "In my opinion Jones is a liar," can cause as much damage to reputation as the statement, "Jones is a liar." As Judge Friendly aptly stated: "[It] would be destructive of the law of libel if a writer could escape liability for accusations of [defamatory conduct] simply by using, explicitly or implicitly, the words 'I think.'" ... It is worthy of note that at common law, even the privilege of fair comment did not extend to "a false statement of fact, whether it was expressly stated or implied from an expression of opinion." [13]

Here, the opinion expressed by Ms. Kane and quoted by Ms. Harriman is to the effect that Dr. Kanaga's conduct fell below the standard of care because she recommended an unnecessary hysterectomy for Dr. Kanaga's profit without concern for Ms. Kane. This was found by the trial court to be defamatory but not actionable because it was expressed as an opinion.[14]

The issue before us is whether or not the article, when read in context, has implanted within it the assertion of fact that Dr. Kanaga's recommendation of a hysterectomy was unnecessary and that Dr. Kanaga's motivation was pecuniary gain. If so, a reasonable jury could find that this implied a false assertion of fact.

Defendants rely on this Court's 1987 opinion in *Riley* for the proposition that statements of opinion are protected speech and that the statements here are as protected as those in *Riley*. *Riley* was decided three years before *Milkovich* and relied on the following dictum in a 1974 United States Supreme Court decision.[15] This Court in *Riley* stated:

Pure expressions of opinion are protected under the First Amendment. ... As the Supreme Court stated in *Gertz:*

> Under the First Amendment there is no such thing as a false idea. However *pernicious* an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.[16]

This Court in *Riley* went on to analyze the opinion jurisprudence as follows:

> [A] defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion....[17]

### Application of the Constitutional Analysis to the Facts of this Case

We do not believe that it is necessary to revisit the current vitality of *Riley* in view of *Milkovich* because *Riley* is distinguishable from the case before us. Aside from the fact that Mr. Riley—unlike Dr. Kanaga—was a public official and therefore a showing of malice would be required,[18] the *Riley* court expressly distinguishes the case where, as here, there are implied assertions of fact. The Court in *Riley* concluded:

> To support a cause of action for libel, the underlying facts must be false as well as defamatory. When an opinion is accompanied by its underlying *nondefamatory* factual basis, a defamation action premised upon that opinion will fail no matter how unjustified, unreasonable or derogatory the opinion might be.... This is so because readers can interpret the factual statements and decide for themselves whether the writer's opinion was justified.[19]

---

13. *Id.*

14. *Kanaga v. Gannett,* slip op. at 14–15, 20, 1995 WL 716938.

15. *Gertz v. Robert Welch, Inc.,* 418 U.S. 323, 94 S.Ct. 2997, 41 L.Ed.2d 789 (1974).

16. *Riley v. Moyed,* 529 A.2d at 251 (quoting *Gertz,* 418 U.S. at 339–40, 94 S.Ct. at 3006–07).

17. *Id.*

18. *New York Times v. Sullivan,* 376 U.S. 254, 84 S.Ct. 710, 11 L.Ed.2d 686 (1964).

19. *Riley,* 529 A.2d at 254 (emphasis in original).

In *Riley*, the plaintiff was a New Castle County Councilman suing *The News Journal* and its columnist for libel. The defendants published a column about ties between politicians and persons with commercial interests. The column stated that Riley "enjoyed a golf outing with developer Albert Marta" and afterwards "seemed more understanding of Marta's [development] plan...." This Court affirmed the grant of summary judgment by the trial court, concluding that the statement about the golf outing was not defamatory and that the statements were constitutionally protected expressions of pure opinion.

As the *Riley* Court noted, a statement of opinion would be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion.[20] Unlike the facts in *Riley*, we are faced with that situation in the case before us where the entire context of the published statements, considered from the viewpoint of the average reader,[21] may imply a false assertion of fact.

### The July 5, 1992 Article

With respect to Ms. Harriman's article dated July 5, 1992, we conclude that the grant of summary judgment in favor of the defendants must be reversed. We find that a reasonable jury could conclude from the entire context of that article that there is an undisclosed defamatory factual basis alleged by Ms. Kane's opinion that Dr. Kanaga's recommendation that Ms. Kane have a hysterectomy was motivated by Dr. Kanaga's desire to profit from an unnecessary and expensive hysterectomy. It is the context which is critical. Here the bold headline states:

### Patient Feels Betrayed

### Says proposed hysterectomy wasn't needed

The essence of the text of the article, as set forth in the opinion of the trial court, states:

Dr. [Kanaga] ... "recommend[ed] unnecessary and inappropriate surgery ..."

[Dr.] Kanaga did not respond to a reporter's telephone calls or a registered letter seeking comments. She has told the medical society she would withhold public comment on the case until the society issues its finding, expected in August.

"I [Kane] believe," ... "Dr. Kanaga has committed a serious breach of the standard of care a patient has the right to expect and the duty of care required of a physician."

"Does this mean I don't need a hysterectomy?"....

"A what?" he [Dr. Domingo] asked incredulously.

"My previous gynecologist said I needed a hysterectomy,"

.    .    .    .    .

"No you don't need one," [Dr. Domingo] said.

"I can only conclude" ... "that Dr. Kanaga ... chose the treatment plan that was most profitable for her with no concern for me...."[22]

Justice Brennan's dissent in *Milkovich* is an appropriate point of departure for the analysis of this case. He did not dispute the majority's articulation of the legal standard, but he disagreed on the application of that standard to the facts of that case. He concluded that there was no implied false assertion of fact. He reasoned that the reporter's:

assumption that Milkovich must have lied at that court hearing is *patently conjecture*.... [The reporter] not only reveals the facts upon which he is relying but he makes it clear at which point he runs out of facts and is *simply guessing*. Read in context, the statements cannot reasonably be interpreted as implying such an assertion as fact ... [497 U.S. at 28, 110 S.Ct. at 2710–11]. *No reasonable reader could understand [the reporter] to be impliedly asserting—as fact—that Milkovich had per-*

---

20. *See supra* note 17 and accompanying text.

21. *See* four-part test of *Ollman v. Evans*, D.C.Cir., 750 F.2d 970, 979–85 (1984) (*en Banc*), *cert. denied*, 471 U.S. 1127, 105 S.Ct. 2662, 86

L.Ed.2d 278 (1985), adopted by this Court in *Riley*, 529 A.2d at 251–52.

22. *Kanaga v. Gannett*, slip op. at 7, 1995 WL 716938.

*jured himself* ... [497 U.S. at 30, 110 S.Ct. at 2711–12]. *Readers ... are signaled repeatedly that the author* does not actually know what Milkovich said at the court hearing and that the author *is surmising,* from factual premises made explicit in the column, that Milkovich must have lied in court ... [497 U.S. at 33, 110 S.Ct. at 2713] ... *[A]s long as it is clear to the reader that he is being offered conjecture* and not solid information, the danger to reputation is one we have chosen to tolerate in pursuit of " 'individual liberty [and] the common quest for truth and the vitality of society as a whole' " [497 U.S. at 36, 110 S.Ct. at 2714–15].[23]

The majority and dissenting opinions of the United States Supreme Court in *Milkovich* and this Court's opinion in *Riley* all teach that there are limits to the perceived safe harbor of opinion in libel actions. Each case must rest on its own facts. Those facts revolve, in part, around the context of the entire writing. When that entire context is considered, it must be "clear to the reader that he is being offered conjecture and not solid information." [24]

In the words of Justice Brennan's dissent in *Milkovich,* it cannot be said that Ms. Kane's opinion as reported by Ms. Harriman is "patently conjecture." The reader is not "signaled repeatedly that the author ... is surmising." A reasonable jury can conclude that the author of the article (Ms. Harriman) and the supplier of information (Ms. Kane) have facts to support their opinion that Dr. Kanaga "betrayed" Ms. Kane by recommending a hysterectomy for Dr. Kanaga's financial gain without regard for the well-being of Ms. Kane. Thus, it is not correct, as the trial court concluded, that it is "clear to the aver-

age reader that Kane added two and two and got nine." [25]

Let us then parse the context of Ms. Harriman's July 5, 1992 article with Justice Brennan's words in mind:

1. The headline directs the reader to the fact that the patient feels "betrayed." [26]

2. The sub-headline signals that the patient claims that the "proposed hysterectomy wasn't needed."

3. The text of the article states that Ms. Kane believes Dr. Kanaga "has committed a serious breach of the standard of care a patient has the right to expect."

4. The article editorializes that Dr. Domingo was allegedly "incredulous" at Dr. Kanaga's recommendation that Ms. Kane needed a hysterectomy.

5. The last sentence of the article asserts that Ms. Kane "can only conclude ... that Dr. Kanaga chose the treatment plan that was most profitable for her with no concern for me."

Applying the test of *Riley,* this is not an opinion "based on nondefamatory facts" [27] because we cannot say as a matter of law that "an ordinary reader would not infer the existence of undisclosed facts." [28] The majority opinion in *Milkovich* makes it plain that (a) the *Gertz* dictum was not "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion' "; [29] and (b) "[e]ven if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of

---

23. *Milkovich,* 497 U.S. at 28–36, 110 S.Ct. at 2710–14 (Brennan, J., dissenting) (emphasis added).

24. *Milkovich,* 497 U.S. at 36, 110 S.Ct. at 2714–15 (Brennan, J., dissenting).

25. *Kanaga v. Gannett,* slip op. at 20, 1995 WL 716938.

26. The Random House Unabridged Dictionary defines "betray" as follows:
   2. to be unfaithful in guarding, maintaining, or fulfilling: *to betray a trust.* 3. to ... be

disloyal to. 4. to reveal or disclose in violation of confidence. ... 7. to deceive, misguide, or corrupt....
RANDOM HOUSE UNABRIDGED DICTIONARY (2d ed. 1993) (emphasis in original).

27. *Riley,* 529 A.2d at 254.

28. *Id.* at 253.

29. *Milkovich,* 497 U.S. at 18, 110 S.Ct. at 2705–06.

fact."[30] As the *Milkovich* Court held, "the connotation that petitioner committed perjury is sufficiently factual to be susceptible of being proved true or false."[31]

Here, the ordinary reader could infer the existence of undisclosed facts which are capable of being proved true or false. Those facts include, for example, that (a) Dr. Kanaga knew or believed that the recommended hysterectomy was not necessary; (b) this conclusion is supported by the fact that Dr. Domingo was able to remove the tumor easily under emergency conditions; (c) Dr. Domingo was "incredulous" (which apparently is denied by him) at the suggestion that a hysterectomy had been recommended by Dr. Kanaga; and (d) Dr. Kanaga's motive was the personal gain she would receive, without concern for the patient, by recommending the more expensive hysterectomy rather than the myomectomy.

As the majority said in *Milkovich*, "Simply couching such statements in terms of opinion does not dispel these implications; and the statement, 'In my opinion Jones is a liar,' can cause as much damage to reputation as the statement, 'Jones is a liar.'"[32] As the dissent stated in *Milkovich*, it should be "clear to the reader that he is being offered conjecture and not solid information."[33] Here, it cannot be said that the ordinary reader would necessarily conclude from Ms. Kane's opinion as stated in the context of Ms. Harriman's article that he or she was being offered pure conjecture. Accordingly, these issues are for the jury.

If a jury decides that there is more to the July 5, 1992 article than pure conjecture, the next issue is whether that which is not pure conjecture can be construed as defamatory. To accuse Dr. Kanaga of recommending unnecessary surgery for her own pecuniary gain is to malign her in her business or profession. Such an accusation, which harms her reputation and tends to disgrace her or bring her into contempt or ridicule, constitutes defamation.[34] Accordingly, if the jury finds that the ordinary reader could infer from the July 5, 1992 article the existence of undisclosed facts that are false and that tend to harm Dr. Kanaga's reputation, lowering her in the estimation of the community, then Dr. Kanaga has been libeled.

### Analysis of the Respective Liability Issues

Should the jury conclude that Dr. Kanaga is a victim of libel, *i.e.*, that the *News Journal* article of July 5, 1992 implied the existence of unstated, defamatory, false facts, each defendant is potentially liable for damage to Dr. Kanaga's reputation. Ms. Kane, as the original source of the expressions, may be held liable. Ms. Harriman and Gannett, as publishers of the expressions, may be held liable.

▮ In the interests of justice and for the guidance of the trial court in the event of trial,[35] it is appropriate that we address generally the relative standards of liability of media defendants and nonmedia defendants. For Dr. Kanaga to recover against Ms. Kane, who is a nonmedia defendant for purposes of this case, it is sufficient that the jury find that the implied statements of fact were both false and defamatory.

The law of defamation embodies the public policy that, generally, individuals must be protected so as to enjoy their good reputations unimpaired by defamatory statements. The general rule is that the publisher and republisher of defamatory matter are strictly accountable and liable in damages to the person defamed, and neither good faith nor honest mistake con-

30. *Id.* at 18–19, 110 S.Ct. at 2705–06.

31. *Id.* at 21, 110 S.Ct. at 2707.

32. *Id.* at 19, 110 S.Ct. at 2706.

33. *Id.* at 36, 110 S.Ct. at 2714–15 (Brennan, J., dissenting).

34. DEL. CONST. art. I, § 9; *Spence v. Funk*, Del. Supr., 396 A.2d 967, 969–71 (1978). *See also Gannett Co., Inc. v. Re*, Del.Supr., 496 A.2d 553

(1985) (affirming lower court's decision to allow determination of defendant's liability to go to the jury where jury found published paragraph damaging to private-figure inventor's reputation).

35. *See* Supr. Ct. R. 8; *Duphily v. Delaware Electric Cooperative, Inc.*, Del. Supr., 662 A.2d 821, 834 (1995); *Jackson v. State*, Del. Supr., 643 A.2d 1360, 1378 (1994).

stitutes a defense, serving only to mitigate damages.[36]

Media defendants require a different analysis, however. As long as the standard adopted is not strict liability, the states are free to "define for themselves the appropriate standard of liability for a publisher or broadcaster of defamatory falsehood injurious to a private individual." [37] We hold, therefore, that Dr. Kanaga cannot recover from Ms. Harriman or Gannett absent at least a showing of negligence.[38]

Accordingly, with respect to the liability of the two media defendants, the jury will have to consider some of the factual issues. We cite only a few, without suggesting either that these are the most important or that there may or may not be more: Was the *News Journal* article of July 5, 1992 a reasonable reporting of Ms. Kane's complaint to the Medical Society or an independent news story about a patient and her doctor? Was it reasonable for Ms. Harriman not to interview Dr. Domingo about the alleged conversation between him and Ms. Kane before reporting that he was "incredulous" about Dr. Kanaga's recommendation? Was it was reasonable for the *News Journal* to run the story without waiting for a decision from the Medical Society?

■ Furthermore, Ms. Harriman and the *News Journal* cannot avail themselves of any privileges in this case. Since Dr. Kanaga is neither a public official nor a public figure, and since the statements published by the *News Journal* do not constitute the fair and accurate reporting of a judicial proceeding or the governmental acts of executive officials of government, the fair report privilege does not protect these statements against actions for libel.[39]

■ Ms. Harriman and the *News Journal* may raise the fair comment privilege as a defense, however, by asserting that they were in fact reporting on a matter of public concern, *i.e.*, the rising costs of health care and the general threat to women's health posed by unscrupulous doctors. Whether this defense is a reasonable one, we leave to the jury. We do emphasize, however, that even if the jury does find that the article concerned a matter of public interest, the fair comment privilege protects only statements of opinion, not express or implied misstatements of fact.[40]

■ Moreover, it may be significant to the jury that this article did not appear as an editorial or as an opinion piece, but as a news story, written by a reporter who apparently specializes in health and medicine articles. Since the context of the statements in libel cases is very important, statements reported in a news article are less likely to be perceived as, and therefore protected as, expressions of pure opinion than are statements appearing in an essay, an editorial or a column.[41]

### Damages

■ With respect to actual damages, it is the law of Delaware that proof of damage

---

36. *Short v. News Journal Co.*, 58 Del. 592, 212 A.2d 718, 719 (1965); Del. Const. art. I, § 9. *But see* RESTATEMENT (SECOND) OF TORTS §§ 558, 577, 580B (1977).

37. *Gertz*, 418 U.S. at 346–47, 94 S.Ct. at 3010.

38. *Gannett Co., Inc. v. Re*, 496 A.2d at 557 (stating, in a defamation case by a private-figure inventor against a newspaper, that a publisher is liable if it negligently publishes libelous matter).

39. The fair report privilege shields the media from liability only for publishing an accurate and fair account of a judicial proceeding or the governmental acts of executive officials of government. *Read v. News–Journal*, Del.Supr., 474 A.2d 119, 120 (1984); *Short v. News–Journal Company*, 58 Del. 592, 212 A.2d 718, 721 (1965); RESTATEMENT (SECOND) OF TORTS § 611 (1977).

40. Under the fair comment privilege, a statement is privileged only when it is a statement of opinion concerning a matter of public interest, and not a false statement of fact. RESTATEMENT (SECOND) OF TORTS § 566 cmt. a (1977).

41. *Compare Riley*, 529 A.2d at 252–53:

> [It] is reasonable to conclude that average readers of the *Morning News* are familiar with [the columnist's] disparaging style of writing.... He *is* a well-known professional provocateur who relies on heavy sarcasm to create controversy or convey a message.... Thus, viewed in the context of the entire article, [the columnist's] writing style and purpose were obviously on display and ordinary readers would be unwilling to infer factual content into his statements.

proximately caused by a publication deemed to be libelous need not be shown in order for a defamed plaintiff to recover nominal or compensatory damages. This is true whether the defamatory nature is apparent on the face of the statement or can be ascertained only by reference to extrinsic facts.[42] Therefore, as long as the jury finds that Dr. Kanaga is the victim of libel, she can recover actual damages. The amount, of course, is for the jury.

■ Additionally, Dr. Kanaga seeks punitive damages. In order to recover punitive damages in an action for libel, a private-figure plaintiff must show that the defendant acted with reckless disregard for the truth of the published statements or with knowledge that the statements were false.[43]

We leave to the trial court the formulation of an appropriate charge to the jury on the damages issue in light of the facts as developed at trial.

### The September 2, 1992 Article

■ In light of the foregoing analysis, we agree with the trial judge that the September 2, 1992 article may not be found to be libelous and it should not be submitted to the jury.[44] Accordingly, we affirm the judgment of the Superior Court dismissing Civil Action No. 94C–09–19–SCD, 1995 WL 716938 filed on September 2, 1994. We express no opinion, however, on the admissibility in evidence of that article or the surrounding circumstances in the trial relating to the July 5, 1992 article. That issue will have to be determined by the trial judge, depending on the purpose for which the article is offered and the circumstances at trial.

### Conclusion

The defining issue in most libel actions is whether the First Amendment rights of the defendants will permit defamatory material to be considered by the jury. We are mindful of the fundamental importance of those constitutional protections to our freedom of expression and the important role of a free media in our society. But, as the opinion of Chief Justice Rehnquist for the majority in *Milkovich* noted in quoting Justice Potter Stewart in his concurring opinion in *Rosenblatt v. Baer:* [45]

> The right of a man to the protection of his own reputation from unjustified invasion and wrongful hurt reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.

·     ·     ·     ·     ·

> The destruction that defamatory falsehood can bring is, to be sure, often beyond the capacity of the law to redeem. Yet, imperfect though it is, an action for damages is the only hope for vindication or redress the law gives to a man whose reputation has been falsely dishonored.

As the *Milkovich* Court concluded in that case, we likewise conclude here that "our decision in the present case holds the balance true," [46] particularly in light of the Delaware constitutional protections accorded one whose *reputation* has been injured,[47] as weighed against one who should be held *responsible* for *abuse* of free speech.[48]

Accordingly, we reverse the judgment of the Superior Court as to Civil Action No. 92C–12–182–SCD, 1995 WL 716938, relating to the July 5, 1992 article, and remand this action for further proceedings consistent with

---

**42.** DEL. CONST. art. I, § 9; *Spence v. Funk,* 396 A.2d at 970–71.

**43.** *See Gertz,* 418 U.S. at 349–50, 94 S.Ct. at 3011–12 (state remedies for private-figure defamation plaintiffs are restricted to actual damages if plaintiffs do not prove defendant acted with knowledge of falsity or reckless disregard for the truth).

**44.** *Kanaga v. Gannett,* slip op. at 22, 1995 WL 716938.

**45.** 383 U.S. 75, 92–93, 86 S.Ct. 669, 679–80, 15 L.Ed.2d 597 (1966) (Stewart, J., concurring), quoted in *Milkovich,* 497 U.S. at 22–23, 110 S.Ct. at 2707–08.

**46.** 497 U.S. at 23, 110 S.Ct. at 2708.

**47.** DEL. CONST. art. I, § 9.

**48.** DEL. CONST. art. I, § 5.

this Opinion. We affirm the grant of summary judgment and the dismissal of Civil Action No. 94C–09–19–SCD relating to the September 2, 1992 article.

ATTACHMENT

### ADDENDUM

#### The News Journal

#### July 5, 1992

#### Patient Feels Betrayed

#### Says proposed hysterectomy wasn't needed

By Jane Harriman

Staff reporter

BRANDYWINE HUNDRED—Pamela Kane feels the hysterectomy urged on her by a gynecologist she trusted would have been unnecessary, and she believes her story should be a warning to other women.

Kane, 45, has filed a complaint with the New Castle County Medical Society against Dr. Margo Kanaga of Wilmington, charging her with "recommending unnecessary and inappropriate surgery and failing to perform proper diagnostic tests or exploring more conservative alternative treatments before scheduling surgery."

Kanaga did not respond to a reporter's telephone calls or a registered letter seeking comments. She has told the medical society she would withhold public comment on the case until the society issues its finding, expected in August.

Kane said that in March, Kanaga told her she should have an abdominal hysterectomy—the removal of her uterus, as well as her ovaries and fallopian tubes, through an incision in her belly—because she had a "prolapsed uterine fibroid," a benign muscle tumor protruding through her cervix.

The procedure would be followed by three days in the hospital and six weeks recuperation at her Brandywine Hundred home.

But when Kanaga called Kane in April to schedule the surgery, Kane decided to test Kanaga.

Kane did not tell Kanaga that a few days earlier, another gynecologist had removed the tumor during a simple pelvic exam, with a twist of his hand. That easy solution proved to Kane that surgery would have been unnecessary.

"Instead of spending several days in the hospital, several weeks recovering and several thousand dollars—whether out of my pocket or paid by my insurance company—for totally unnecessary surgery, ... I was hardly the worse for wear," Kane said. "And I felt better the next day than I had in weeks."

"I believe," Kane wrote in her complaint, "Dr. Kanaga has committed a serious breach of the standard of care a patient has the right to expect and the duty of care required of a physician."

Kane's problems began in March, when she had an extremely heavy menstrual period and called Kanaga's office. The receptionist speculated Kane needed a dilation and curettage, a diagnostic procedure in which the lining of the uterus, shed in menstruation, is scraped out for laboratory analysis. The procedure itself may resolve heavy bleeding.

But when Kanaga examined Kane April 2, she told Kane she had a protruding fibroid that would block a D & C. "I'll have to do a hysterectomy," Kane recalls Kanaga saying.

Kanaga asked if Kane's insurance company required a second opinion. Kane didn't know, so Kanaga told her to check. Kanaga suggested that Kane not pay much attention to a second opinion as alternatives that might be mentioned were just experimental.

Kane recalls asking if Kanaga could remove the fibroid and leave the uterus. Kanaga told her no. Kane made appointments with two gynecologists, for second and third opinions. She began to have second thoughts about a hysterectomy.

With children at home and a computer software business to run, she was not anxious to be laid up for six weeks. She remembered reading about newer, less-invasive pro-

cedures that could sometimes prevent hysterectomy. She did some research, she said, learning that ovarian cancer is rare and "that hysterectomy can cause long-term physiological and psychological problems extending far beyond the post-operative recovery. ... I was not informed of any of those risks by Dr. Kanaga though she did explain the risks of surgery to me and the need for estrogen replacement therapy afterward."

---

**She learned that ovarian cancer is rare and that hysterectomy can cause long-term problems.**

---

Before Kane could get a second opinion, she began to menstruate heavily. The night of April 19, she went to St. Francis Hospital's emergency room.

There, Kane recalled, a gynecologist grasped the fibroid with forceps and said, "I'm just going to give it a twist to see how it's attached." He immediately held up a lime-size piece of red tissue and said, "Here's your tumor."

It had been attached to her uterus by a slender stem.

The doctor did a D & C, told her everything seemed fine and asked her to visit his office in a couple of weeks.

"Does this mean I don't need a hysterectomy?" she recalls asking.

"A what?" he asked incredulously.

"My previous gynecologist said I needed a hysterectomy," Kane said.

"No, you don't need one," he said.

At home, Kane began to fume. "I wondered how many women are getting unnecessary hysterectomies," she recalled.

On April 29 she called Kanaga's office, planning to tell her what had happened. But before she could, she was asked by an office worker if she'd had the second opinion. She said yes.

The office worker said insurance would only pay 80 percent, so Kanaga would need Kane's share, $500, before surgery. The staffer asked when Kane would like to have surgery, and told her to call Kanaga the next day at noon.

But at 7:40 the next morning, Kanaga called Kane's house. When Kane called her back, Kanaga asked who she'd seen for the second opinion.

"No one local," Kane fibbed.

"Good," said Kanaga.

"Why 'good?'" Kane questioned.

"Unbiased," said Kanaga. "What did they say?"

"What you said, that I had a protruding fibroid tumor."

"When did you want to schedule surgery?" Kanaga asked. They selected a date in May.

A few days later, Kane contacted Kanaga's office, said she was having second thoughts, and asked if they could refer her to a surgeon who would just remove the tumor. The office gave Kane the number of a doctor-referral service. A few days later, Kane received a certified letter from Kanaga dismissing her from her practice in "the interest of patient care."

On May 11, Kane visited the gynecologist she'd seen at St. Francis. He said everything was normal.

"I can only conclude," Kane wrote in her complaint to the medical society, "that Dr. Kanaga, fully aware because of my age and presenting condition [heavy bleeding] I was in a 'gray area' where the proposed surgery might be defensible ... chose the treatment plan that was most profitable for her with no concern for me. ..."

*The News Journal*

**September 2, 1992**

### Medical unit backs doctor on treatment

By JANE HARRIMAN

Staff reporter

WILMINGTON—The New Castle County Medical Society has decided that a hysterec-

tomy would have been appropriate treatment for a woman of 45, although Pamela Kane's problem was easily resolved subsequently without surgery.

"... Medicine is not an exact science," Dr. Richard Winkelmayer, chairman of the society's Professional Conduct Committee, wrote in an Aug. 27 letter to Kane, a Brandywine Hundred resident. "For most medical conditions there are usually a number of different treatment alternatives depending on the individual patient and the physician's training, experience and philosophy."

Doctors who studied Kane's case felt hysterectomy "was one of several appropriate therapies for someone in your age group," Winkelmayer wrote.

In her complaint this spring, Kane said Dr. Margo Kanaga, a Wilmington gynecologist, urged her to have her ovaries and uterus removed because she had a prolapsed uterine fibroid, a benign muscle tumor protruding through her cervix. The operation would have caused "surgical menopause," and Kane would have had to take estrogen.

Before Kane could get a second opinion required by health insurance, she went to the hospital emergency room with severe bleeding. A gynecologist removed the tumor, the cause of the bleeding, with a twist of the wrist during a regular pelvic exam. A dilation and curettage (a diagnostic procedure that scrapes out the lining of the uterus for laboratory examination) then showed Kane did not need a hysterectomy.

Kane felt Kanaga had been "recommending unnecessary and inappropriate surgery and failing to perform proper diagnostic tests or exploring more conservative alternative treatments before scheduling surgery."

Over the past 50 years, doctors have often recommended hysterectomy for women who no longer can, or want, to bear children.

But the procedure is expensive, and involves a hospital stay of three to four days, with a recovery period of up to six weeks.

Kane said Tuesday, "The only question they [the medical society] answered was one I didn't ask: Whether or not I am in a gray area ... It was not very responsive ... the whole thing is very backward."

Kanaga did not respond to The News Journal's request for comment.

Many gynecologists are doing less radical surgery for some fibroids. When a fibroid is small and accessible, a trained surgeon can use laparoscopic techniques (tiny incisions and pencil-sized instruments) to remove only the tumor, sparing the uterus and ovaries. The woman goes home the next day and is back at work in a day or two.

Kane feels Kanaga should have advised her the new procedure was available.