# IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| SCOTT D. COUSINS, | § | |
| | § | No. 272, 2021 |
| Plaintiff Below, | § | |
| Appellant, | § | Court Below: Superior Court |
| | § | of the State of Delaware |
| v. | § | |
| | § | C.A. No. S20C-11-036 |
| ROSEMARY S. GOODIER, | § | |
| | § | |
| Defendant Below, | § | |
| Appellee. | § | |

Submitted: May 25, 2022
Decided: August 16, 2022

Before **SEITZ**, Chief Justice; **VAUGHN**, **TRAYNOR**, **MONTGOMERY-REEVES**, Justices; and **NEWELL**, Chief Judge,[1] constituting the Court *en banc*.

Upon appeal from the Superior Court. **AFFIRMED**.

Stephen J. Neuberger, Esquire (*argued*), Thomas S. Neuberger Esquire, THE NEUBERGER FIRM, P.A., Wilmington, Delaware, *for Plaintiff Below, Appellant Scott D. Cousins*.

Rodney A. Smolla, Esquire (*argued*), Wilmington, Delaware; Douglas D. Herrmann, Esquire, TROUTMAN PEPPER HAMILTON SAUNDERS LLP, Wilmington, Delaware, *for Defendant Below, Appellee Rosemary S. Goodier*.

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

**TRAYNOR**, Justice:

This appeal presents difficult questions concerning the actionability of speech that is defamatory—that is, injurious to a person's reputation—but that is defended on the ground that it is an expression of opinion and not of fact. We are asked to decide whether the First Amendment bars claims for defamation and tortious interference with contract against a defendant who, in an email to a law firm, described as "shockingly racist" a lawsuit filed by one of the firm's partners in his personal capacity. The suit aimed to preserve a nearby high school's "Indian" mascot.

The partner, who claims to have lost his position with the law firm because of the email, sued his detractor, contending that the characterization of his lawsuit is demonstrably false and pleading four causes of action, including defamation and tortious interference with contract. The partner's detractor, in response, contends that her statements about the partner are opinions protected by the First Amendment's Free Speech Clause. The Superior Court agreed with the detractor and dismissed the partner's tort action.

For the reasons that follow, we affirm the judgment of the Superior Court. The statements at issue do not on their face contain demonstrably false statements of fact, nor do they imply defamatory and provably false facts. As statements concerning an issue of public concern, moreover, they are entitled to heightened First Amendment protection and cannot form the predicate of the plaintiff's tort claims.

2

I

A

In August 2020, Plaintiff Scott Cousins, a Pennsylvania resident, was a partner in a prominent Delaware law firm.[2]  On August 5, he filed a *pro se* complaint against the Unionville-Chadds Ford (Pennsylvania) School District in a Pennsylvania state court (the "Unionville Lawsuit").  Before that, Cousins had been an outspoken opponent of the district's efforts to retire the Unionville High School mascot, which took the form of the letter "U" draped by a feather, a vestige of the high school's nickname—the "Indians."[3]

Less than an hour after Cousins filed the Unionville Lawsuit, Defendant Rosemary Goodier sent the following email to Cousins' employer, Bayard, P.A., with the subject line "Recently Filed Lawsuit Against Unionville Chadds Ford School District Reflects Poorly on the Bayard Firm":[4]

> Members of our community wish to bring to the firm's attention the lawsuit filed by one of your directors, Scott Cousins, against the Unionville Chadds Ford School District. . . .

---

[2] App. to Opening Br. at A10.  We draw the facts from the well-pleaded allegations in Cousins' November 30, 2020 complaint in this case as well as documents integral to the complaint or incorporated in it by reference.

[3] The mascot at issue in the Unionville Lawsuit was denominated the "Indians."  This decision refers to the Unionville mascot in that way for the purpose of discussing the parties' dispute. Additionally, this decision uses the term "American Indian" when discussing the ongoing national debate about the use of American Indian iconography in sports logos.  In its 2019 "Tribal Nations and the United States" report, the National Congress of American Indians defined "American Indian" as a "[p]erson[] belonging to the tribal nations of the continental United States[.]" Nat'l Congress of Am. Indians, *Tribal Nations and the United States* 11 (2019).

[4] App. to Opening Br. at A46.

In all likelihood, your Management Committee approved this suit, but in the event that it did not, we would like to bring it to your attention. We hope you can reflect upon how shockingly racist and tone deaf this suit is, particularly in light of the present demands against the school board, who has to deal with getting students back to school safely in the midst of a deadly pandemic. We can't help but wonder why the firm would support an action that would divert precious resources away from the safety of the community's children to perpetuating an offensive and outdated school mascot. This action is even more troubling in light of the fact that Mr[.] Cousins' child has graduated and no longer attends the school. Our tax dollars and administrative resources will be plunged into countering some shockingly racist statements by Mr[.] Cousins about protecting his white, Christian heritage.

We have no official role, connection, or representation with respect to the school board or the district. We raise these issues solely in our capacity as concerned parents and taxpayers; as such, we are reaching out to you in the hope your firm is better than throwing its support behind this horrific lawsuit.

Rosemary Goodier

Although the entire email is relevant on appeal, the parties focus their arguments on the following two statements found in it:

(1) "We hope you can reflect upon how shockingly racist and tone deaf this suit is, particularly in light of the present demands against the school board [related to COVID-19]."

(2) "Our tax dollars and administrative resources will be plunged into countering some shockingly racist statements by Mr. Cousins about protecting his white, Christian heritage."[5]

---

[5] *Id.*

The email also contained a link to a news article entitled "Lawsuit filed against Unionville over mascot issue."[6] The morning after Goodier sent the email, Bayard's firm administrator emailed Cousins to inform him of the firm's receipt of Goodier's missive, noting, among other things, that "there are some unhappy individuals over the filing" of the Unionville Lawsuit.[7] Approximately three hours later, Bayard's president called Cousins to discuss the fallout from the Unionville Lawsuit and Goodier's email.

According to Cousins' complaint in this case, the firm's president told him that, despite what Goodier had to say, he knew that Cousins was not a racist.[8] Still, the president explained his view that, given the circumstances around the Unionville Lawsuit, "the firm can't say that."[9] The president apparently stated further that the Unionville Lawsuit had caused "negative consequences" for the Bayard firm, including the loss of business, that none of the partners agreed with Cousins' Unionville Lawsuit, and that the partners had lost confidence in Cousins. The president demanded Cousins' resignation from the firm's executive committee and from the firm. The following day, rather than forcing his partners to vote to expel him from the firm, Cousins resigned.

---

[6] *Id.*
[7] *Id.* at A26.
[8] *Id.* at A27.
[9] *Id.*

Following his resignation from the firm, Cousins' efforts to secure employment met with failure. Each potential employer asked Cousins about "his unannounced and sudden departure from Bayard."[10] Despite inquiries or applications to over 50 potential employers—over 40 in-house counsel opportunities and over 15 law firms, according to the complaint—Cousins was unable to find suitable employment. In October 2020, he started his own law firm.

B

After resigning, Cousins filed a four-count complaint in the Superior Court alleging that Goodier tortiously interfered with his employment agreement with Bayard, defamed him with her email, and conspired with unnamed defendants to injure him. Cousins also claimed that these unnamed defendants aided and abetted Goodier in violating his rights.[11]

Goodier moved under Superior Court Civil Rule 12(b)(6) to dismiss Cousins' complaint for failing to state a claim upon which relief could be granted. In her motion, Goodier flipped the order in which Cousins had pleaded his claims and led off with her argument that the statements she included in her email to Bayard were "constitutionally protected opinion"[12] and, as such, were "protected under the

---

[10] *Id.* at A30.
[11] *Id.* at A37–40.
[12] Super. Ct. Dkt. No. 15 at 2.

6

common law and the First Amendment."[13]  Goodier followed that with her contention that Cousins' three other counts were "simply duplicative of his defamation claim. . . . [and] [i]f those statements are not actionable as defamation, they are not actionable as tortious interference, conspiracy, or aiding and abetting."[14] After briefing and oral argument, the Superior Court agreed with Goodier and dismissed Cousins' complaint.[15]

The Superior Court based its dismissal of Cousins' defamation claim on various grounds.  First, the court categorized the accusations in Goodier's email to the Bayard firm as "'subjective speculation' or 'merely rhetorical hyperbole'" and thus not actionable.[16]  The court also applied the four-part test developed by the United States Court of Appeals for the District of Columbia Circuit in *Ollman v. Evans*[17] and adopted by this Court in *Riley v. Moyed*.[18]  The Superior Court concluded that Goodier's email did not communicate false statements of fact but instead expressed "non-actionable opinion."[19]  Finally, the court found that Goodier had "made it clear that she was critiquing [Cousins'] lawsuit, which had been the subject of media coverage and had been reviewed by members of Bayard."[20]  This,

---

[13] *Id*. at 3.
[14] *Id*. at 5.
[15] *Cousins v. Goodier*, 2021 WL 3355471 (Del. Super. Ct. July 30, 2021).
[16] *Id*. at *4 (quoting *Doe v. Cahill*, 884 A.2d 451, 466 (Del. 2005)).
[17] *Ollman v. Evans*, 750 F.2d 970 (D.C. Cir. 1984).
[18] *Riley v. Moyed*, 529 A.2d 248 (Del. 1987).
[19] *Cousins*, 2021 WL 3355471, at *4.
[20] *Id*. at *7.

7

according to the court, represented a disclosure by Goodier of "the underlying non-defamatory factual basis for her email," which thereby undermined Cousins' defamation claim.[21]

The Superior Court then turned to Cousins' tortious-interference-with-contract, civil-conspiracy, and aiding-and-abetting claims and dismissed them on two grounds. Noting that these three additional tort claims rested on the same statements that formed the basis of Cousins' defamation claim, the court held that, "[i]f those statements are not actionable as defamation, they are not actionable as tortious interference with contract, conspiracy, or aiding or abetting."[22] The court also determined that Cousins' tortious interference claim failed in the absence of an allegation that Goodier's sole motivation was to interfere with Cousins' employment contract with Bayard. According to the court, under our decision in *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*,[23] a claim of improper interference with another's contract lies only if the defendant's sole motive was to interfere.

C

In this appeal, Cousins asks us to reverse the Superior Court's dismissal of his complaint for two reasons. Returning to his preferred order of argument, he argues first that he adequately pleaded a claim for tortious interference and that the Superior

---

[21] *Id.*
[22] *Id.*
[23] *WaveDivision Holdings, LLC v. Highland Capital Mgmt., L.P.*, 49 A.3d 1168 (Del 2012).

8

Court's conclusion amounts to the mistaken theory that "the federal First Amendment is a an automatic get-of-out-jail-free card" that provides immunity from state common-law tort claims.[24] Cousins maintains that tortious interference can lie even where the only asserted interference takes the form of otherwise protected speech.[25] Goodier responds that the First Amendment bars any tortious interference claim that "rests on the same predicate act" as a failed defamation claim.[26]

Next, Cousins argues that he adequately pleaded a claim for defamation because Goodier's statements are objectively verifiable assertions of fact. Alternatively, Cousins claims that, even if the statements are opinion, they imply the existence of undisclosed defamatory facts and are actionable under our decision in *Ramunno v. Cawley*.[27] Goodier counters that her statements express an opinion about Cousins' Unionville Lawsuit that cannot be proven false and therefore are not actionable.[28] Cousins does not contest the Superior Court's dismissal of his civil-conspiracy and aiding-and-abetting claims.

## II

We review the Superior Court's granting of a motion to dismiss a complaint under Rule 12(b)(6) *de novo* "to determine whether the judge erred as a matter of

---

[24] Opening Br. at 21.
[25] *Id*. at 7.
[26] Answering Br. at 31–32.
[27] *Ramunno v. Cawley*, 705 A.2d 1029, 1036 (Del. 1998); Opening Br. at 37–41.
[28] Opening Br. at 11.

law in formulating or applying legal precepts."[29] Whether a challenged statement can reasonably be interpreted as communicating actionable defamatory facts about an individual is a question of law.[30] We thus review the trial court's determinations in this area *de novo*.[31] Otherwise, at the motion-to-dismiss stage we accept all well-pleaded allegations of a complaint as true and do not dismiss a claim if it would succeed on any reasonably conceivable set of facts.[32]

## III

The Free Speech Clause of the First Amendment provides that "Congress shall make no law . . . abridging the freedom of speech[.]"[33] This bar does not prevent Congress and the States from imposing liability for defamatory speech, subject to a number of constitutional guardrails.[34] Slander refers to oral defamation, while libel is written defamation and is the first tort at issue in this case.[35]

A statement is defamatory when it "tends so to harm the reputation of another as to lower him in the estimation of the community or to deter third persons from

---

[29] *Windsor I, LLC v. CW Capt. Asset Mgmt.*, 238 A.3d 863, 871 (Del. 2020) (quoting *Deuley v. DynCorp Int'l., Inc.*, 8 A.3d 1156, 1160 (Del. 2010)).

[30] *Slawik v. News-Journal Co.*, 428 A.2d 15, 17 (Del. 1981); *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 18–19 (1990).

[31] *Clinton v. Enterprise Rent-A-Car Co.*, 977 A.2d 892, 895 (Del. 2009); *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499 (1984).

[32] *Cent. Mortg. Co. v. Morgan Stanley Mortg. Cap. Holdings LLC*, 27 A.3d 531, 538 (Del. 2011).

[33] U.S. Const. amend. I.

[34] *Cahill*, 884 A.2d at 456 (citing *Chaplinsky v. New Hampshire*, 315 U.S. 568, 572 (1942)).

[35] *Spence v. Funk*, 396 A.2d 967, 970 (Del. 1978).

associating or dealing with him."[36]  But not all defamatory statements are actionable. Instead, a defamation plaintiff must plead and ultimately prove that the defendant made a statement about the plaintiff that would be understood as defamatory by a reasonable third party and was published,[37] meaning that it was "communicat[ed] by any method, to one or more persons who can understand the meaning."[38]  There is no "liability without fault" in this area of the law, so the private plaintiff must show that the defendant acted at least negligently, while the public-figure plaintiff must demonstrate that the defendant acted with actual malice.[39]  Additionally, when the challenged statement is on a matter of public concern, the plaintiff must demonstrate that the statement was false.[40]  Finally, and as we discuss in more detail below, statements on matters of public concern that may be labeled "opinion" are not

---

[36] Restatement of Torts § 559 (1938).  This definition appears in the original Restatement of Torts as well as the Second Restatement, and it was adopted by this Court in *Spence v. Funk*, 396 A.2d at 969.

[37] *Page v. Oath Inc.*, 270 A.3d 833, 843 (Del. 2022) (quoting *Cahill*, 884 A.2d at 463).

[38] Dobbs, et al., *The Law of Torts* § 520, p. 176 (2011).

[39] *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 347 (1974); *Page*, 270 A.3d at 843; *New York Times, Inc. v. Sullivan*, 376 U.S. 254, 287 (1964).

[40] *Phila. Newspapers, Inc. v. Hepps*, 475 U.S. 767, 775–76 (1986) ("We believe that the common law's rule on falsity—that the defendant must bear the burden of proving truth—must similarly fall here to a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.").  We pause here to note that *Hepps* constrained its analysis to cases involving media defendants.  *Id.* at 766–67. The United States Supreme Court has not addressed whether the *Hepps* rule—requiring defamation plaintiffs to prove the falsity of statements that address a matter of public concern—applies to nonmedia defendants such as Goodier.  That said, we agree with Judge Sack and the majority of courts that have addressed this question: "As in other areas of defamation law, courts have tended to shy away from a press/non-press distinction.  They apply *Hepps*—and therefore the *Hepps*-based protection for opinion—to non-media defendants." Robert D. Sack, *Protection of Opinion under the First Amendment*, 100 Colum. L. Rev. 294, 326 (2000) (collecting cases).

11

categorically shielded from actionability. Instead, such statements can support a defamation claim when they can reasonably be interpreted as stating or implying defamatory facts about an individual that are provably false.[41]

At this early stage of the case, the parties contest two elements of Cousins' defamation claim.[42] *First*, Cousins claims that Goodier's speech did not address a matter of public concern, while Goodier argues the opposite.[43] This disputed issue is important because statements on matters of public concern receive "special protection" under the First Amendment and also must be provably false to be actionable.[44] *Second*, Cousins and Goodier disagree about whether her statements represent what some courts call "pure opinion," or whether they can reasonably be understood as stating or implying defamatory and provably false facts about Cousins.[45]

---

[41] *Kanaga v. Gannett Co., Inc.*, 687 A.2d 173, 177–78 (Del. 1996) (citing *Milkovich*, 497 U.S. at 18–19); Restatement (Second) of Torts § 566 ("A defamatory communication may consist of a statement in the form of an opinion, but a statement of this nature is actionable only if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."); *Shearin v. E.F. Hutton Grp., Inc.*, 652 A.2d 578, 591 & n.16 (Del. Ch. 1994) (Allen, C.) ("Most of the statements allegedly made about plaintiff make normative judgments about actions which, it is undisputed, plaintiff took. To this extent, no valid defamation claim has been stated.").

[42] In his complaint in this case, Cousins asserted that Goodier acted with actual malice, a required showing when the defamation plaintiff is a public figure, *Page*, 270 A.3d at 842 (citing *New York Times*, 376 U.S. at 287), or is a private figure in search of punitive damages, *Gertz*, 418 U.S. at 349; Compl. ¶¶ 144–151, App. to Opening Br. at 28. Goodier did not move to dismiss on this ground but explained to the Superior Court that she intended to contest it if the complaint survived a motion to dismiss. App. to Opening Br. at A53.

[43] Opening Br. at 27; Answering Br. at 38.

[44] *Snyder v. Phelps*, 562 U.S. 443, 458 (2011); *Gertz*, 418 U.S. at 347.

[45] Opening Br. at 36–37; Answering Br. at 13.

For the reasons discussed below, we hold that Goodier's email to Bayard was speech that addressed a matter of public concern: the ongoing national debate about the use of American Indian iconography in sports logos. We then conclude that Goodier's statements cannot be proven true or false and do not imply that they are supported by undisclosed defamatory facts.[46] The Superior Court was therefore correct to dismiss Cousins' defamation claim.

A

In her email to Bayard, Goodier asked the firm to "reflect upon how shockingly racist and tone deaf this suit is," wondered "why the firm would support an action that would divert precious resources away from the safety of the community's children to perpetuating an offensive and outdated mascot," and

---

[46] As our analysis should make clear, we base our holdings in this case on the United States Constitution and not on any independent and adequate Delaware-law grounds. Cousins invokes Article I, § 9 of the Delaware Constitution, which, as we explained in *Kanaga*, "establishes a strong state constitutional basis for remedies to recompense damage to one's reputation." 687 A.2d at 177. *Kanaga* concerned speech that, in our view, was not protected by the First Amendment, *id.* at 176, therefore implicating Delaware's provision of "remedy by the due course of law" to those who suffer reputational injuries. Del. Const. art. I, § 9. This guarantee is strong, but it cannot operate when the United States Constitution precludes liability, as it does in this case. Put differently, Delaware may offer its citizens *more* protection for their speech than what is provided by the United States Constitution—as the Delaware Constitution does in other areas, such as searches and seizures, *see Juliano v. State*, 254 A.2d 369, 378 (Del. 2020)—but the State cannot go beneath the constitutional floor established by the First Amendment. *See* Jeffrey S. Sutton, Randy J. Holland, Stephen R. McCallister, and Jeffrey M. Shaman, *State Constitutional Law: The Modern Experience* iii (West 2020) ("[S]o long as state constitutional protection does not fall below the federal floor, a state court may interpret its own state constitution as it chooses, irrespective of federal constitutional law." (forward by former Chief Justice E. Norman Veasey)). Here, the First Amendment protects Goodier's speech, which means that we cannot interpret the Delaware Constitution to nevertheless subject Goodier to liability.

13

lamented that "our tax dollars and administrative resources will be plunged into countering some shockingly racist statements by Mr[.] Cousins about protecting his white, Christian heritage."[47] Critical to Cousins' assertion that Goodier's email is not entitled to protection under the Free Speech Clause of the First Amendment is his insistence that the above concerns were merely private in nature. As Cousins sees things, Goodier communicated as a private citizen to Cousins' private Delaware-based employer about a Pennsylvania lawsuit brought against a Pennsylvania school district. As such, in Cousins' view, Goodier's email should not be accorded the special First Amendment protection that ordinarily attends speech on issues of concern to the community. We disagree.

Cousins' interest in characterizing Goodier's email as an expression of a private gripe is understandable. At common law, truth was an affirmative defense to a claim of defamation, meaning that defamatory statements could be actionable even if "the factfinding process [was] unable to resolve conclusively whether the speech [was] true or false."[48] But in *Philadelphia Newspapers, Inc. v. Hepps*, the United States Supreme Court determined that, when the challenged statements address matters of public concern, "the common law's rule on falsity—that the defendant must bear the burden of proving truth—must . . . fall . . . to a

---

[47] App. to Opening Br. at A46.
[48] *Hepps*, 475 U.S. at 776.

14

constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages."[49]  And, in *Snyder v. Phelps*,[50] the Court recognized that the First Amendment's Free Speech Clause can serve as a defense in state tort suits, but that the extent of that protection "turns largely on whether that speech is of public or private concern, as determined by all the circumstances of the case."[51]  Quoting numerous decisions of the Court, Chief Justice Roberts explained that:

> Speech on matters of public concern . . . is at the heart of the First Amendment's protection.  The First Amendment reflects a profound national commitment to the principle that debate on public issues should be uninhibited, robust, and wide-open.  That is because speech concerning public affairs is more than self-expression; it is the essence of self-government.  Accordingly, speech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.[52]

According to *Snyder*, "[s]peech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community.'"[53]  This classification is "determined by the content, form, and context of a given statement, as revealed by the whole record."[54]

---

[49] *Id.*

[50] *Snyder*, 562 U.S. at 451.

[51] *Id.*

[52] *Id.* at 451–52 (internal citations and quotation marks omitted).

[53] *Id.* at 453 (quoting *Connick v. Myers*, 461 U.S. 138, 146 (1983).

[54] *Connick*, 461 U.S. at 147–48.

Beginning with the content of Goodier's email to the Bayard firm, it plainly addresses a matter of public concern to the community.[55]  According to the newspaper account that was linked to the email, the Unionville Lawsuit sought a preliminary injunction to postpone a vote by a public body—the Unionville Chadds-Ford School District—on the fate of the Unionville Indian mascot."[56]  It further reported that Cousins claimed that he would suffer immediate, substantial, and irreparable harm if the Indian mascot were to be retired.[57]  Cousins himself "[c]alled for school administrators to set up a Citizen Advisory Committee, consisting of school directors, administrators, parents, residents and even members of the Leni-Lenape Indian Tribe, for which the mascot is based."[58]  And Goodier's email not only expressed her view that the objective of the lawsuit was "shockingly racist and tone deaf," but also bemoaned the waste of public resources that would attend the defense against Cousins' lawsuit.[59]

It is not within our purview to adjudicate the longstanding controversy surrounding mascots and symbols that use American Indian iconography.  But that the recognition of such mascots and symbols is controversial and has been for

---

[55] *See Snyder*, 562 U.S. at 454.

[56] Fran Maye, *Lawsuit Filed Against Unionville Over Mascot Issue*, Daily Local News (Aug. 5, 2020) https://www.dailylocal.com/2020/08/05/lawsuit-filed-against-unionville-over-mascot-issue-2. *See* App. to Opening Br. at A20, A46.

[57] Maye, *Lawsuit Filed Against Unionville Over Mascot Issue*.

[58] *Id.*

[59] App. to Opening Br. at A46.

decades is scarcely subject to doubt.[60]  Whatever one might think of Goodier's tactics for communicating her views on this issue, it is clear to us that the subject matter of her email "can 'be fairly considered as relating to any matter of political, social, or other concern to the community,'" and therefore addresses a matter of public concern.[61]

Cousins attempts to undercut the public relevance of Goodier's statements by appealing to the "form and context" analysis described by *Snyder*.[62]  Cousins' principal contention here is that, because Goodier's email was "private" and sent to Cousins' Delaware-based employer, her only motivation was to harm Cousins and not to advance any public debate of the issues pervading Cousins' lawsuit in Pennsylvania.  This argument misses the mark for three reasons.

In the first place, the allegations in Cousins' complaint undermine the notion that Goodier's criticism of Cousins' Unionville Lawsuit was limited to one private

---

[60] *See, e.g.,* Andrew Beaton, *Redskins, Indians, and the Long Push to Drop Native American Mascots*, Wall St. J. (July 5, 2020) ("[T]eam names and traditions relating to Native Americans have been criticized as dehumanizing for decades.  Yet the response to those calls has never led to uniform change, leaving high schools in small towns and professional teams worth billions of dollars to make their own decisions about various monikers and imagery.") https://www.wsj.com/articles/redskins-indians-and-the-long-push-to-drop-native-american-mascots-11593961353; *see also* Corey Kilgannon, *Facing a Ban, a School District Fights to Keep 'Indian' Nickname*, N.Y. Times (Jan. 29, 2022) (describing how proponents of changing "Indians" nickname of New York high school "hoped [it] would be a teachable moment" but instead were "met with tremendous backlash:  Friendships have been severed and obscene gestures have been exchanged. Lawn signs emblazoned with the logo and a slogan, 'Restore the Pride,' have become ubiquitous.") https://www.nytimes.com/2022/01/29/nyregion/native-american-mascot-cambridge.html.
[61] *Snyder*, 562 U.S. at 453 (quoting *Connick*, 461 U.S. at 146).
[62] *Id.* (quoting *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 761 (1965)).

17

email to the Bayard firm. Cousins alleges that on the same day as Goodier sent the email "and for several days thereafter, . . . [Goodier's] defamatory statements were widely published on Facebook within and without the local Wilmington[,] Delaware legal community and the general public at large[.]"[63] Although Cousins has not produced Goodier's Facebook posts, which he says were removed, his allegation militates against the suggestion that the discussion provoked by his Unionville Lawsuit was confined to a single email designed to cost him his job.

Second, Cousins' attempt to cabin to Pennsylvania the relevance of the Unionville Lawsuit and the public controversy that both preceded and surrounded it ignores the fact that Unionville High School is approximately ten miles from the Delaware/Pennsylvania border and sixteen miles from the Bayard offices. It is widely known, moreover, in our relatively small legal community that many Delaware lawyers—apparently including Cousins and Goodier—reside in Chester County, Pennsylvania, where Unionville is located. In short, to suggest that a public controversy in nearby Unionville involving a Delaware lawyer is of no interest to members of the Delaware legal community is untenable.

Third, even if we were to accept that Goodier's email to Bayard was a purely private communication, Cousins' "form and context" argument still falls flat. This is because speech that is communicated privately may still address a matter of public

---

[63] App. to Opening Br. at A24.

concern. This much is clear from the United States Supreme Court's decision in *Connick v. Myers*, where the Court explained that its cases "safeguarding speech on matters of public concern" implicated examples of both public and private expression.[64] Indeed, as the Third Circuit explained when applying *Connick* in *Azarro v. Cnty. of Allegheny*, "if the content and circumstances of a private communication are such that the message conveyed would be relevant to the process of self-governance if disseminated to the community, that communication is public concern speech even though it occurred in a private context."[65]

We therefore hold that Goodier's email to Bayard was speech on a matter of public concern. Thus, the email is entitled to "special protection" under the First Amendment, and Cousins must show that it contained false statements in order to recover under the tort of defamation. With this established, we turn next to Cousins' claim that Goodier's statements are provably false or imply defamatory, and provably false, facts about Cousins.

B

Among other charges, Goodier's email alleged that Cousins' Unionville Lawsuit was "shockingly racist and tone deaf" and that it included "shockingly racist

---

[64] *Connick*, 461 U.S. at 145–146 (first citing *Perry v. Sindermann*, 408 U.S. 593 (1972); then citing *Mt. Healthy City Bd. of Educ. v. 146 Doyle*, 429 U.S. 274 (1977); then citing *Givhan v. Western Line Consolidated School Distr.*, 439 U.S. 410 (1979)).
[65] *Azarro v. Cnty. of Allegheny*, 110 F.3d 968, 977–78 (3d Cir. 1997).

statements by Mr[.] Cousins about protecting his white, Christian heritage."[66] Because we have determined that the email addressed a matter of public concern—the use of American Indian iconography in sports logos—we must now decide whether Goodier's heated statements are provably false or, if they are not, whether they imply the existence of actionable defamatory facts about Cousins. In our view, an ordinary reader would not understand Goodier's email in this way. Dismissal of the defamation claim was therefore appropriate.

1

The Superior Court's thoughtful opinion in this case can be read as proposing a stark "fact versus opinion" divide—with statements of fact actionable but statements of opinion privileged—in defamation law.[67] This is a result, we think, of decades of doctrinal development in which our decisions, and those of the United States Supreme Court, have advanced evolving approaches to dealing with statements of opinion in defamation cases. Put differently, the status of statements labeled "opinion" in defamation law has not always been clear.

Before 1964, the United States Supreme Court considered defamation to be a matter of state tort law and criminal law without First Amendment implications.[68]

---

[66] App. to Opening Br. at A46.

[67] *Cousins*, 2021 WL 3355471, at *3 ("I must decide 'whether alleged defamatory statements are expressions of fact or protected expressions of opinion.'" (quoting *Riley*, 529 A.2d at 251)).

[68] Lenn Niehoff and E. Thomas Sullivan, *Free Speech: From Core Values to Current Debates* 96 (Cambridge 2022).

In *New York Times Co. v. Sullivan*, however, the Court recognized that defamation actions can have a chilling effect on the discussion of important public issues and held, among other things, that libel—written defamation—"can claim no talismanic immunity from constitutional limitations. . . . [and] must be measured by standards that satisfy the First Amendment."[69] Included among those standards is the rule that "absolutely prohibits punishment of truthful criticism."[70] In the years following *Sullivan,* the Court recognized constitutional limits on the *type* of speech that could be the subject of state defamation actions. In particular, the Court held that communications that could be characterized as "rhetorical hyperbole"[71] or "obvious parody"[72] are not actionable under state law despite their arguably harmful content.

Then, in 1987, this Court confronted the question whether expressions of opinion, as opposed to statements of fact, are entitled to the protection of the Free Speech Clause of the First Amendment. Drawing on an oft-quoted passage from *Gertz v. Robert Welch, Inc.*[73]— "[u]nder the First Amendment there is no such thing

---

[69] *New York Times Co. v. Sullivan*, 376 U.S. 254, 269 (1964).

[70] *Garrison v. Louisiana*, 379 U.S 64, 78 (1964).

[71] *Greenbelt Coop. Publ'g Assn., Inc. v. Bressler*, 398 U.S. 6 (1970) (characterization of developer's negotiating position as blackmail "was no more than rhetorical hyperbole, a vigorous epithet used by those who considered [the developer's] negotiating position extremely unreasonable" (brackets in original)).

[72] *Hustler Magazine, Inc. v. Falwell*, 485 U.S. 46 (1988) (holding that public figures "may not recover for the tort of intentional infliction of emotional distress" without establishing the required elements of a defamation claim, including actual malice).

[73] *Gertz*, 418 U.S. at 339–40 ("Under the First Amendment there is no such thing as a false idea. However pernicious an opinion may seem, we depend for its correction not on the conscience of judges and juries but on the competition of other ideas. But there is no constitutional value in false statements of fact.")

21

as a false idea"—we answered the question unequivocally in the affirmative: "[p]ure expressions of opinion are protected under the First Amendment."[74]  We then adopted the four-part test for determining whether an ordinary reader would view a statement as one of fact or one of opinion from *Ollman v. Evans*.[75]  Under that test:

> First, the Court should analyze the common usage or meaning of the challenged language.  Second, the Court should determine whether the statement can be objectively verified as true or false.  Third, the Court should consider the full context of the statement.  Fourth, the Court should consider the broader social context into which the statement fits.[76]

Noting that the threshold determination whether a statement is actionable defamation is a question of law, our decision in *Riley* applied the *Ollman* test and concluded that the allegedly defamatory publication by a newspaper columnist about a county council member's interactions with a real-estate developer contained constitutionally protected expressions of "pure opinion."[77]

Before this Court had another opportunity to address the treatment of opinion in defamation cases, the United States Supreme Court took up the issue in *Milkovich v. Loraine Journal Co.*, a defamation action brought by a high school wrestling coach against a newspaper and journalist for publishing a column that implied that

---

[74] *Riley*, 529 A.2d at 251.
[75] *Ollman*, 750 F.2d at 970.
[76] *Riley*, 529 A.2d at 251–52 (internal citations omitted).
[77] *Id.*

the coach had lied under oath in a judicial proceeding.[78]  The Supreme Court rejected the notion that *Gertz* was "intended to create a wholesale defamation exemption for anything that might be labeled 'opinion.'"[79]  Addressing the use of multi-factor tests to separate opinion from fact, the Court explained that the approach taken in *Ollman* and adopted by this Court in *Riley* "was a mistaken reliance on the *Gertz* dictum" and that the "'breathing space' which '[f]reedoms of expression require in order to survive' . . . is adequately secured by existing constitutional doctrine without the creation of an artificial dichotomy between 'opinion' and fact."[80]

In place of the four-factor test proposed by *Ollman*, the *Milkovich* decision adopted a simpler inquiry.  Under *Milkovich*, the Constitution protects a statement "relating to matters of public concern which does not contain a provably false factual connotation[.]"[81]  The Constitution also shields from liability "statements that cannot 'reasonably [be] interpreted as stating actual facts' about an individual."[82]  Reading these statements together, we understand *Milkovich* to hold that statements on matters of public concern are actionable in defamation when, even if presented as "opinion," they may be reasonably construed as stating or implying defamatory facts

---

[78] *Milkovich*, 497 U.S. at 17–18.
[79] *Id*. at 18 (citing *Gertz*, 418 U.S. at 339–40).
[80] *Id*. at 19 (quoting *Hepps*, 475 U.S. at 772) (alteration in original).  The *Milkovich* Court was familiar with the *Riley* test: the respondents in the case cited *Riley* in their answering brief. *Milkovich v. Lorain J. Co.* (No. 89-645), Br. of Respondents at *22, 1990 WL 505644.
[81] *Milkovich*, 497 U.S. at 20.
[82] *Id*. (quoting *Hustler*, 485 U.S. at 50) (alteration in original).

about an individual that are provably false.[83] On the other hand, "if it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable."[84]

Although *Milkovich* shunned the stark "opinion v. fact" analysis this Court conducted in *Riley* and eschewed the *Ollman* test, in *Kanaga v. Gannett Co.*,[85] we declined to revisit the *Riley* decision.[86] Our reasoning was that "the *Riley* court

---

[83] *Id.* at 19 (citing *Cianci v. New Times Publ'g Co.*, 639 F.2d 54, 64 (2d Cir. 1980)); *see also Milkovich*, 497 U.S. at 18–19 ("Even if the speaker states the facts upon which he bases his opinion, if those facts are either incorrect or incomplete, or if his assessment of them is erroneous, the statement may still imply a false assertion of fact. Simply couching such statements in terms of opinion does not dispel these implications[.]"). As we read *Milkovich*, the *sine qua non* of defamation when the challenged statement addresses a matter of public concern is objective verifiability, whether or not the statement is labeled "opinion." This appears to have been a point of agreement among the majority and the two dissenters, Justices Brennan and Marshall, in *Milkovich* itself. 497 U.S. at 23 (Brennan, J., dissenting) ("I agree with the Court that . . . only defamatory statements that are capable of being proved false are subject to liability under state libel law."). Other courts have come to the same conclusion. *See, e.g., Competitive Enter. Inst. v. Mann.*, 150 A.3d 1213, 1242 (D.C. Cir. 2016) ("a statement is actionable if viewed in context it 'was capable of bearing a defamatory meaning and . . . contained or implied provably false statements of fact.'") (quoting *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 597 (D.C. 2000) (alteration in original)); *Chapin v. Knight-Ridder, Inc.*, 993 F.2d 1087, 1093 (4th Cir. 1993) ("Though opinion *per se* is not immune from a suit for libel, a statement is not actionable unless it asserts a provably false fact or factual connotation."); *Gast v. Brittain*, 589 S.E.2d 63, 64 (Ga. 2003) ("An opinion can constitute actionable defamation if the opinion can reasonably be interpreted, according to the context of the entire writing in which the opinion appears, to state or imply defamatory facts about the plaintiff that are capable of being proved false."); *Baker v. Los Angeles Herald Examiner*, 721 P.2d 87, 90 (Cal. 1986) ("The *sine qua non* of recovery for defamation . . . is the existence of a falsehood.") (quoting *Letter Carriers v. Austin*, 418 U.S. 264, 283–84 (1974) (applying federal labor law) (alteration in original)).

[84] *Haynes v. Alfred A. Knopf, Inc.*, 8 F.3d 1222, 1227 (7th Cir. 1993) (Posner, J.). Judge Posner's summation has been cited with approval by numerous state and federal courts. *See* Sack, *supra* note 40, at 323 (collecting cases).

[85] *Kanaga*, 687 A.2d at 173.

[86] *Id.* at 178.

expressly distinguish[ed] the case where, as here, there are implied assertions of fact."[87]  Indeed, our opinion in *Kanaga* reiterated the principle recognized in *Riley*, and consistent with *Milkovich*, that "a statement of opinion would be actionable if it implies the allegation of undisclosed defamatory facts as the basis for the opinion."[88]

Two years later, in *Ramunno v. Cawley*, we shed light on how the "undisclosed defamatory fact" exception works.[89]  Ramunno, a landlord, had sued Cawley for libel—written defamation, the same tort at issue in this case—based on a letter Cawley had sent to a local newspaper stating, among other things, that Ramunno had "done well through poorly maintained" properties.[90]  According to Ramunno, this statement was intended to imply that Ramunno was a "slumlord."[91] The Superior Court dismissed Ramunno's complaint because it viewed the statements at issue as constitutionally protected opinion.[92]  Relying on *Kanaga* and *Milkovich*, we reversed, explaining that the claim that Ramunno had "done well through poorly maintained properties. . . . may suggest a defamatory factual basis not disclosed by the speaker."[93]  We further explained that:

> What is crucial is that the average reader is unable to discern the source of the statement.  Nothing in the letter signals to the audience that Cawley is surmising or reasoning from facts made explicit in the letter.

---

[87] *Id.*
[88] *Id.* at 179.
[89] *Ramunno*, 705 A.2d at 1029.
[90] *Id.* at 1036.
[91] *Id.* at 1032.
[92] *Id.* at 1035.
[93] *Id.*

*Readers are simply left to wonder what facts underlie Cawley's derogation of Ramunno's real estate portfolio.* These circumstances, we feel, fall squarely within the scope of *Kanaga* and *Milkovich*.[94]

Our *Ramunno* decision also synthesized the constitutional status of opinion in defamation actions after the *Gertz*, *Riley*, *Milkovich*, and *Kanaga* decisions:

> It is generally true that courts are reluctant to impose liability for the expression of opinions. But there is no wholesale exemption from defamation law for any statement cast in the form of an opinion. Rather, a defamation action may lie where an opinion implies the existence of an undisclosed defamatory factual basis.[95]

It followed from this rule statement—and, indeed, from *Milkovich*—that the *Ollman* factors, while perhaps helpful, were no longer appropriately treated as dispositive in defamation actions. We therefore explained that, because "a statement cast as an opinion is actionable if it implies the existence of undisclosed defamatory facts, we caution against an overly rigid application of the four-part *Riley* test."[96]

We are aware that some courts continue to apply the *Ollman* factors, or similar tests, in defamation actions where a purported statement of opinion is at issue, and that the Superior Court did so in this case.[97] In addition to objective verifiability,

---

[94] *Id.* at 1037 (emphasis added).
[95] *Id.* at 1036.
[96] *Id.* at 1038 n.34.
[97] *See, e.g., Davis v. Boeheim*, 22 N.E. 3d 999, 1005 (N.Y. 2014) ("We apply three factors in determining whether a reasonable reader would consider the statement connotes fact or nonactionable opinion[.]"); *Gilbrook v. City of Westminster*, 177 F.3d 839, 861–62 (9th Cir. 1999) (three-factor test); Sack, *supra* note 40, at 324 ("Even the *Ollman*-type factors used to identify statements of opinion survived *Milkovich* despite *Milkovich*'s explicit disapproval of them.").

which we view as the *sine qua non* of defamation actions[98]—at least where a public figure or matter of public concern is implicated—we acknowledge that it may be useful to consider the common usage, context, and social setting of a statement. But such consideration should be in service of the streamlined analysis articulated by *Milkovich*.[99] We undertake this review next: our focus is on whether Goodier's statements, which clearly address a matter of public concern, may be reasonably understood as stating or implying defamatory facts about Cousins that are provably false.

2

As discussed, a plaintiff in a defamation action must show that the defendant made a published statement about the plaintiff that would be understood as defamatory by a reasonable third party.[100] Here, there is no meaningful dispute that Goodier's email was defamatory: accusing Cousins of filing a "shockingly racist" lawsuit containing "shockingly racist statements . . . about protecting his white, Christian heritage" obviously tended to harm Cousins' reputation, "lower him in the estimation of the community[,]" and "deter third persons from associating or dealing

---

[98] *See supra*, note 83.

[99] *See Haynes*, 8 F.3d at 1227 ("[I]f it is plain that the speaker is expressing a subjective view, an interpretation, a theory, conjecture, or surmise, rather than claiming to be in possession of objectively verifiable facts, the statement is not actionable.").

[100] *Page*, 270 A.3d at 843; *Cahill*, 884 A.2d at 463; *Ramunno*, 705 A.2d at 1035; Dobbs, et al., *The Law of Torts* § 520, p. 176 (2011).

with him."[101]  It is also undisputed that Goodier's email to the Bayard firm was published to one or more persons capable of understanding its meaning.  What remains contested is whether the statements made in the emails can reasonably be read to state or imply provably false and defamatory facts about Cousins.  We hold that they cannot.

We begin with Goodier's statements themselves, suspending for now our consideration of whether they imply any defamatory and provably false facts about Cousins.  We do not believe that these allegations, which turn on Goodier's personal view of what is racist, are provably false.  It cannot be denied America is in the midst of an ongoing national debate about what it means to be racist.  To be sure, there is nearly universal agreement that some behaviors are racist: these include the use of racial slurs, the practicing of overt racial discrimination, and the commission of racially motivated violence.  Indeed, instances of racial discrimination are commonly litigated under Title VII of the Civil Rights Act of 1964.[102]  But when a wider net is cast, this consensus quickly vanishes: it is clear to us that Americans disagree about a long and growing list of things that to some are racist and to others are not.[103]  It is not our role here to enter into this debate and decide who is right and

---

[101] Restatement of Torts § 559 (1938); *Spence*, 396 A.2d at 969.

[102] *See* 42 U.S.C. § 2000, *et seq.*

[103] John McWhorter, *Words Have Lost Their Common Meaning*, The Atlantic (March 31, 2021) (noting that "[t]he word *racism* has become almost maddeningly confusing in current usage[]" and

28

who is wrong.[104]  In fact, we think that the First Amendment is clear that doing so would be the opposite of our role.  It suffices that we conclude that Goodier's statements, on their face, cannot reasonably be interpreted as stating actual facts. Ordinary readers of her email, instead, would understand her adjectival use of the word "racist" and her reference to Cousins' "white, Christian heritage" as expressing her subjective interpretation of the tone and objectives of the Unionville Lawsuit. That interpretation, in our view, is not, without more, objectively verifiable as true or false.

That said, this case does not end with a facial evaluation of Goodier's statements.  This is because statements may be actionable not only if they are provably false themselves, but also if they can be reasonably understood to imply defamatory and provably false facts about the subject.  As the United States Supreme Court made clear in *Milkovich*, and as we held in *Ramunno*, "a defamation action

_____

that the "usage of *racism* has yet to stop occasioning controversy; witness the outcry when Merriam-Webster recently altered its definition of the word to acknowledge the 'systemic' aspect." (emphasis in original)) https://www.theatlantic.com/ideas/archive/2021/03/nation-divided-language/618461/.  *Compare* Ibraham X. Kendi, *How To Be An Antiracist*, 18, 22 (defining "racist" as "[o]ne who is supporting a racist policy by their actions or inaction or expressing a racist idea" and defining "racist policy" as "any measure that produces or sustains racial inequity between racial groups."), with "Racist," Merriam-Webster, https://www.merriam-webster.com/dictionary/racists (last visited August 7, 2022) (defining "racist" as "having, reflecting, or fostering the belief that race. . . is a fundamental determinant of human traits and capacities and that racial differences produce an inherent superiority of a particular race" and "of, relating to, or characterized by the systemic oppression of a racial group to the social, economic, and political advantage of another[.]").

[104] *See, e.g.*, *Stevens v. Tillman*, 855 F.2d 394, 402 (7th Cir. 1988) (concluding that the term "racist" has been used so variously as to have been "drain[ed] . . . of its former, decidedly opprobrious meaning" and to now "fit comfortably within the immunity for name-calling.").

29

may lie where an opinion implies the existence of an undisclosed defamatory factual basis."[105]  Here, Cousins argues that "[t]he actionable assertion of fact is that review of the [Unionville Lawsuit] will reveal that it contains 'shockingly racist statements.'"[106]  This implication is actionable, according to Cousins, because Goodier did not include the Unionville Lawsuit in her email to Bayard, leaving the firm's partners to speculate, for example, about what "shockingly racist" statements Cousins made.  We disagree.

Cousins is correct that, as reproduced in the record, Goodier's email does not attach, or contain a link to, the Unionville Lawsuit.  But his argument that Goodier failed to disclose the factual basis for her statements fails to account for the other information Goodier shared with Bayard.  Although she did not provide the Unionville Lawsuit, Goodier did include a link to a newspaper article that described the lawsuit.  Cousins quotes this article at length in his complaint in this case; it is properly part of the record, even at the motion-to-dismiss stage, because of Cousins' reliance on it.[107]  From this excerpt alone, it is clear that the article explained

---

[105] *Ramunno*, 705 A.2d at 1036–37 (citing *Milkovich*, 497 U.S. at 18–19).
[106] Opening Br. at 38.
[107] App. to Opening Br. at A20; *Wal-Mart Stores, Inc. v. AIG Life Ins. Co.*, 860 A.2d 312, 320 (Del. 2004) ("On a motion to dismiss, the Court may consider documents that are 'integral' to the complaint[.]"); *see also In re GGP S'holder Litig.*, 2022 WL 2815820, at *1 n.3 (Del. July 19, 2022) ("The facts are drawn from the well-pleaded allegations in the . . . Complaint as well as from documents integral to the Complaint or incorporated in it by reference[.]").  On this point we note, too, that Cousins' complaint in the Unionville Lawsuit is quoted extensively in Cousins' complaint in this case and, as a result, is also fairly considered part of the record.  App. to Opening Br. at

30

Cousins' lawsuit and included statements made by Cousins in the Unionville Lawsuit:[108]

> "Certainly, American history is replete with horrific acts of violence against Native People," Cousins said in the suit. "It is without question that Man's Laws have failed to live up to our founding principles based on Natural Law. Anyone who suggests that Native People have never been victimized has not seriously studied American history. We need to study history — not cancel it, revise it or eradicate it — in order to ensure that the victimization of Native People never happens again. Simply claiming that Native People were victimized in the past, however, is unrelated to whether the Unionville High School Mascot honors these great nations and the proud history of Native People."

The article also stated that "[i]n the court filing, Cousins describes himself as a Christian, adult, white, heterosexual male" and that, according to Cousins, his "ancestors were not white European imperialists" and did "not believ[e] that they were inherently superior to non-white groups, did not support the genocide of the Native Peoples[,] and fought to end 250 years of African slavery."[109]

Additionally, in his complaint in this case, Cousins describes himself as a controversial figure within the Bayard firm and, "for over 2 ½ years, . . . a leading opponent" of the Unionville School District's efforts to retire its mascot.[110] The complaint also acknowledges that the mascot had, in the past, spawned

---

A22–23. Although we are required to accept Cousins' well-pleaded allegations as true, we are not required to accept as complete his partial quotations from the document that gave rise to the allegedly tortious statements we are now asked to evaluate.

[108] App. to Opening Br. at A20.

[109] *Id.* at A19.

[110] *Id.*

"stereotypical iconography and a tomahawk chop cheer."[111] And, as discussed above, the complaint we evaluate in this appeal quotes liberally from the article about the Unionville Lawsuit that Goodier shared with Bayard. Thus, it was abundantly clear to the members of the Bayard firm who read and acted in response to Goodier's email and the included news report that the objective of the lawsuit about which she complained was the preservation of the Unionville Indian mascot, a cause that Cousins had apparently pursued in a prominent fashion for years. And it is this cause that Cousins concedes is the target of Goodier's charge of racism.[112]

To put the point in a nutshell, unlike in *Ramunno*, where "[r]eaders [were] simply left to wonder what facts under[lay] Cawley's derogation of Ramunno's real estate portfolio,"[113] the essential fact upon which Goodier based her accusations was disclosed to the readers of her email at the Bayard firm. Those readers, moreover, were sophisticated lawyers who knew how to find the Unionville Lawsuit, even if the record does not show at this stage whether they in fact reviewed it. Indeed,

---

[111] *Id.*

[112] At the second oral argument in this appeal, Cousins' counsel identified the thrust of Goodier's accusations as follows:

> "She's referencing in her email that there are shockingly racist statements, I mean, it's what her email says, that there are shockingly racist statements by Mr. Cousins that need to be countered. That's an express assertion of fact. There are or there aren't. Finally, I think the gist of the entire email is that the actual filing of this lawsuit, the lawsuit in its entirety, is shockingly racist as well."

May 25, 2022 Oral Argument at 41:20–55, *Cousins v. Goodier* (No. 272, 2021) https://livestream.com/accounts/5969852/events/10395719/videos/231348126.

[113] *Ramunno*, 705 A.2d at 1037; *see also Milkovich*, 497 U.S. at 27 n.3 ("clear disclosure of a comment's factual predicate precludes a finding that the comment implies other defamatory facts[.]" (Brennan, J., dissenting)).

Cousins admits that Bayard's president told him that none of Cousins' partners at the firm agreed with the Unionville Lawsuit.[114] Taken together, these facts indicate to us that the recipients of Goodier's email did not have to speculate or wonder about the facts underpinning Goodier's statements. This reality is sufficient to defeat Cousins' claim that Goodier's email implies defamatory facts about Cousins that are provably false. The Superior Court's dismissal of Cousins' defamation claim was justified.

IV

A

Under Delaware law, to prevail on a tortious interference claim, a plaintiff must show that the defendant knew of a contract involving the plaintiff, intentionally and improperly interfered with it, and was a significant factor in causing the contract to be breached or otherwise terminated.[115] Whether any interference was "improper" focuses on the means used and the presence of any legal justification to interfere.[116]

There is no disagreement that Cousins' complaint sufficiently alleges that Goodier sought to interfere with his employment at Bayard and was successful in doing so. This, by all odds, appears to have been one of the obvious objectives of

---

[114] App. to Opening Br. at A26.

[115] *WaveDivision*, 49 A.3d at 1174 (citing *Irwin & Leighton, Inc. v. W.M. Anderson Co.*, 532 A.2d 983, 992 (Del. Ch. 1987)); *ASDI, Inc. v. Beard Rsch., Inc.*, 11 A.3d 749, 751 (Del. 2010) (breach of contract not required for claim of tortious interference).

[116] *WaveDivision*, 49 A.3d at 1173–74.

her email. The focus of the dispute is whether Goodier's interference was legally improper. We agree with the Superior Court that, when a tortious interference claim rests on statements that are protected by the First Amendment and no additional improper conduct is alleged, the tortious interference claim must fail.[117]

Many tortious interference cases feature speech. After all, words are generally used to form contracts, and they are also used to breach and interfere with them. The First Amendment does not categorically preclude claims of breach or interference. Rather, as our cases and the examples provided in the Restatement (Second) of Torts show, whether speech is actionable as tortious interference depends in part on the type of speech used.[118] In some instances, speech constitutes actionable improper interference because it communicates threats of violence or illegal conduct, fraud, or actionable defamation.[119] What these types of expression have in common is that they are not protected by the First Amendment.[120] As a result, there is no

---

[117] *Cousins*, 2021 WL 3355471, at *7.

[118] Restatement (Second) of Torts § 767.

[119] *WaveDivision*, 49 A.3d at 1174 (explaining that "[a] fraudulent misrepresentation is ordinarily an improper means of interference and precludes a defense of justification" but determining that no such fraud occurred); Restatement (Second) of Torts § 767 cmt. c (listing the following as examples of interference: physical violence, misrepresentations, wrongful use of civil and criminal litigation, and unlawful conduct); *see also Diver v. Miller*, 148 A. 291, 293 (Del. Super. Ct. 1929) (observing that a tortious interference claim is generally available "where the breach of the contract has been brought about not by mere persuasion but by fraudulent representations, threats, intimidation, defamatory statements, or other unlawful means."); *NAMA Holdings, LLC v. Related WMC LLC*, 2014 WL 6436647, at *29 (Del. Ch. Nov. 17, 2014); *Raytheon Co. v. BAE Sys. Tech. Sols. & Servs. Inc.*, 2017 WL 5075376, at *13 (Del. Super. Ct. Oct. 30, 2017).

[120] *See, e.g., Virginia v. Black*, 538 U.S. 343, 359 (2003) ("Threats of violence are outside the First Amendment[.]") (quoting *R.A.V. v. City of St. Paul, Minn.*, 505 U.S. 377, 388 (1992) (alteration in

34

constitutional barrier to sanctioning these words as improper and imposing liability

under tort theories such as tortious interference.

In a second group of cases, the speech at issue is commercial.[121] It may be

expressed by a business competitor hoping to draw away customers or talent from a

rival, as we discussed in *ASDI, Inc. v. Beard Research Inc.*,[122] or by creditors

"motivated at least in part by a desire to protect their investment[,]" as in

*WaveDivsion*.[123] Unlike threats, defamation, and fraud, commercial speech is

protected by the First Amendment if it concerns lawful activity and is not

misleading.[124] Even then, however, the government may regulate commercial

speech if the regulation advances a substantial governmental interest and is not more

---

original)); *Cent. Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of New York*, 447 U.S. 557, 566 (1980) ("For commercial speech to come within [the First Amendment], it at least must concern lawful activity and not be misleading.").

[121] Restatement (Second) of Torts § 767 cmt. c (listing the following as examples of interference: the application of economic pressure and the violation of business-specific ethical codes).

[122] *ASDI*, 11 A.3d at 751 (recognizing a claim for tortious interference where the trial court found that defendants had held meetings where they discussed taking away business from competitor) (citing *Beard Rsch., Inc. v. Kates*, 8 A.3d 573, 609 (Del. Ch. 2010) (finding that defendants had "meetings where [they] talked about how they were going to take away business, including the Pfizer Contract, [] and laughed at the prospect of accomplishing this.")); *see also ASDI*, 11 A.3d at 752 (citing *Neyer, Tiseo & Hindo, Ltd. v. Russell*, 1993 WL 334951, at *1–5 (E.D.Pa. Aug. 26, 1993) (wrongful interference included covert meetings with rival's clients to induce transfer of key contract, as well as efforts to recruit rival's employees)).

[123] *WaveDivision*, 49 A.3d at 1174.

[124] *Cent. Hudson Gas & Elec. Corp.*, 447 U.S. at 556.

extensive than necessary.[125]  Thus, commercial speech may or may not support a claim for tortious interference, depending on the facts of the case.[126]

The statements by Goodier in her August 5 email do not fit the situations discussed above.  They are not fraudulent, misleading, or commercial.[127]  Nor are they actionable in defamation because, as we have already determined, they are not objectively verifiable.  Unlike the examples found in our cases and in the Restatement,[128] Goodier's speech is fully protected—indeed, it enjoys "special protection" because it addresses a matter of public concern[129]—by the First Amendment.  This is fatal to Cousins' claim, which focuses exclusively on Goodier's protected speech and no other conduct.

The United States Supreme Court's decision in *Snyder v. Phelps*,[130] which we have already discussed, makes clear that, in circumstances like these, the First Amendment bars state tort suits.  So too does the Court's seminal decision in this area, *NAACP v. Claiborne Hardware Co.*[131]  In *Claiborne*, a Mississippi state court

---

[125] *Id.*

[126] *See* Restatement (Second) of Torts § 768 & cmt. b (subject to various limitations, "[o]ne's privilege to engage in business and to compete with others implies a privilege to induce third persons to do their business with him rather than with his competitors. In order not to hamper competition unduly, the rule stated in this Section entitles one not only to seek to divert business from his competitors generally but also from a particular competitor.").

[127] Goodier's email explains that she and her unidentified supporters "raise these issues solely in our capacity as concerned parents and taxpayers."  App. to Opening Br. at A46.

[128] Restatement (Second) of Torts § 767 cmt. c; *supra* notes 119, 121.

[129] *Snyder*, 562 U.S. at 458.

[130] *See supra* pp. 13–19.

[131] *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982).

36

held the NAACP, a group called Mississippi Action for Progress, and several individuals who participated in a civil rights-related boycott liable for private businesses' lost earnings under the tort of "malicious interference with the [affected] businesses."[132]  The Mississippi Supreme Court upheld the imposition of liability on this basis, but the United States Supreme Court reversed.  While making it clear that individuals who engaged in violence or threats of violence as part of the boycott could be held responsible for the injuries they caused—this being an example of independently wrongful conduct—the Court held that "the boycott clearly involved constitutionally protected activity."[133]  Relevant here is the Court's conclusion that "the nonviolent elements of the petitioners' activities [were] entitled to the protection of the First Amendment," even though the positions taken by the organizers of and participants in the boycott caused others—by design—to cease their business interactions with the plaintiffs. [134]

Cousins' response to *Claiborne* focuses on the boycott's ultimate objective of influencing the government to comply with a list of demands for equality and racial justice.[135]  On that basis, he attempts to distinguish the boycott from Goodier's "purely private actions, directed only to private parties, not petitioning of

---

[132] *Id*. at 891.
[133] *Id*. at 911.
[134] *Id*. at 915.
[135] Opening Br. at 23–26.

government or calls for democratic change."[136]  This ignores that the plaintiffs in *Claiborne* were private business owners and the transactions that were interrupted by the boycott were private transactions.  It also overlooks the point we made earlier: the community's interest in the free exchange of information and ideas relating to matters of public concern is not limited to public declarations.[137]

In sum, we are unpersuaded by Cousins' efforts to distinguish *Claiborne*.  We are not alone: overwhelmingly, courts that have considered the interaction of defamation and tortious interference have come to the conclusion we reach today.  For instance, the New Hampshire Supreme Court concluded that a municipality's tortious interference claim against protestors who followed parking-enforcement officers and criticized their work failed because "holding the respondents liable for tortious interference based upon their alleged activities would infringe upon the respondents' right to free speech under the First Amendment."[138]  In another case, the United States Court of Appeals for the Eighth Circuit affirmed the dismissal of a store's tortious interference claim against union protestors who called for a boycott and engaged in picketing and related activities.  According to the court, "allowing a tortious interference cause of action to proceed against the Union for its

---

[136] *Id*. at 26.
[137] *See Azzaro*, 110 F.3d at 977.
[138] *City of Keene v. Cleaveland*, 118 A.3d 253, 261 (N.H. 2015).

conduct . . . would amount to an impermissible restraint on the Union's First and Fourteenth Amendment rights."[139]

These cases are not outliers.[140] And, save Cousins' dubious refrain that they involve public protest on public issues while Goodier's email was "only private speech, in a private place, sent to a private employer"[141]—a characterization we have rejected—he has no answer to them. The result is that Cousins cannot make a *prima facie* case of tortious interference: the elements of that tort require some conduct that is wrongful or improper, but Goodier's speech is not, standing on its own, wrongful or improper in the legal sense, and we are shown nothing else that supports liability. We therefore agree with the Superior Court that Goodier's statements are not actionable as tortious interference. Although we could end our analysis here, we

---

[139] *Beverly Hills Foodland, Inc. v. United Food & Com. Workers Union, Local 655*, 39 F.3d 191, 197 (8th Cir. 1974).

[140] *See, e.g., Blatty v. New York Times Co.*, 42 Cal.3d 1033, 1045 (Cal. 1986); *Resolute Forest Prods., Inc. v. Greenpeace Int'l*, 302 F. Supp. 3d 1005, 1016 (N.D. Cal. 2017) ("Therefore, claims which are similar to defamation, such as tortious interference with contractual or prospective relationships 'are subject to the same [F]irst [A]mendment requirements that govern actions for defamation.'") (quoting *Unelko Corp. v. Rooney*, 912 F.2d 1049, 1058 (9th Cir. 1990)); *Others First, Inc. v. Better Bus. Bureau of Greater St. Louis, Inc.*, 829 F.3d 576, 580 (8th Cir. 2016) (if the [statement] contained no actionable injurious falsehood . . . [the plaintiff] needed to submit sufficient evidence of some other independently wrongful action to avoid summary judgment dismissing its tortious interference claim."); *Redco Corp. v. CBS, Inc.*, 758 F.2d 970, 973 (3d Cir. 1985) (unless defendants "can be found liable for defamation, the intentional interference with contractual relations count is not actionable"); *Eddy's Toyota of Wichita, Inc. v. Kmart Corp.*, 945 F. Supp. 220, 224 (D. Kan. 1996) ("[T]he court agrees with defendant that the letters in this circumstance are protected free speech and cannot form a basis for plaintiff's tortious interference claim.").

[141] Reply Br. at 9.

39

take this opportunity to address certain aspects of Cousins' argument that warrant careful attention.

B

Cousins' challenge to the Superior Court's dismissal of his tortious interference with contract claim, though articulated in a labyrinthine combination of subsidiary propositions, can be distilled down to two basic contentions.[142] *First*, according to Cousins, the First Amendment does not shield Goodier from a claim of tortious interference because that tort has different elements, and protects different interests, than the tort of defamation.[143] *Second*, Cousins argues that the Superior Court incorrectly read our decision in *WaveDivision* as requiring tortious interference plaintiffs to show that the defendant's sole motive was interference.[144]

We agree with Cousins that, under *WaveDivision*, a defendant need not have a singular motive to interfere in order to be liable for tortious interference. That said,

---

[142] Cousins makes a number of supporting claims that, in our view, are not persuasive. We evaluate many of them in the body of our analysis. Here, we note that Cousins' assertion that Goodier was herself motivated by racial animus as evidenced by her use of the word "white" to describe Cousins is unpersuasive. *See* Opening Br. at 11–13 (Section 2(d)(1)(a)-(b)). Among other things, Cousins apparently described himself as a "Christian, adult, white, heterosexual male" in the Unionville Lawsuit, according to his complaint in this case. App. to Opening Br. at A20. Additionally, Cousins' citation to *Lloyd v. Jefferson*, 53 F.Supp.2d 643, 650–52 (D.Del. 1999) does not support his claim because *Lloyd* is plainly distinguishable from the facts of this case and also involved multiple misrepresentations. *See* Opening Br. at 9, 14–17, 22. Finally, Cousins suggests that Goodier's assertions, if true, constituted violations of an ethics rule prohibiting racial discrimination or harassment. *Id.* at 13–14. Goodier did not invoke this rule in her email, and we do not believe that the existence of such a rule removes Goodier's speech from the protection of the First Amendment.

[143] *Id.* at 28–30.

[144] Opening Br. at 18–19.

we affirm the Superior Court's dismissal of the tortious interference claim because the First Amendment protects Goodier's statements, precluding Cousins from proving that they constituted improper interference.

1

Although he acknowledges that it is not "on all fours with our present case,"[145] Cousins relies upon *Cohen v. Cowles Media Co.* in support of his contention that, because "common law contractual claims can be enforced over First Amendment objections, so too can common law tort claims arising from unjustified interference in those same contracts."[146] We think that this argument misunderstands the holding of *Cowles Media.*

The question before the United States Supreme Court in *Cowles Media* was "whether the First Amendment prohibits a plaintiff from recovering damages, under state promissory estoppel law, for a newspaper's breach of a promise of confidentiality given to the plaintiff in exchange for information."[147] Cohen, a political operative, provided newspapers owned by Cowles Media with court records concerning a rival party's political candidate. Cohen did so in reliance upon a promise of confidentiality from the newspapers' reporters. Despite this promise, the papers identified Cohen in their stories, and he was fired from his job. Employing a

---

[145] *Id.* at 27.
[146] *Cohen v. Cowles Media Co.*, 501 U.S. 663 (1991).
[147] *Id.* at 665; Opening Br. at 29.

41

promissory estoppel theory, Cohen sued Cowles Media in Minnesota state court and lost. On appeal, the Minnesota Supreme Court explained that "enforcement of the promise of confidentiality under a promissory estoppel theory would violate defendants' First Amendment rights."[148]

The United States Supreme Court reversed. In so doing, it explained, first, that plaintiffs cannot use other torts to end-around the elements of a defamation claim—including falsity and, if applicable, actual malice—as this would be "attempting to use [the] cause of action to avoid the strict requirements for establishing a libel or defamation claim."[149] But the Court concluded that Cohen's promissory estoppel claim was logically distinct from a claim in defamation, which Cohen did not bring.[150] The Court cited various reasons for this determination, including that Cohen was seeking damages for loss of employment rather than harm to reputation, and that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news."[151] Cousins seizes on these points, particularly the latter statement, and suggests that his tortious interference claim deserves similar treatment.[152]

---

[148] *Cohen v. Cowles Media Co.*, 457 N.W.2d 199, 205 (Minn. 1990), *rev'd*, 501 U.S. 663 (1991).
[149] *Cowles Media*, 501 U.S. at 671.
[150] *Id*.
[151] *Id*. at 669.
[152] Opening Br. at 28.

We disagree. Cousins' argument sidesteps the crux of the Court's reasoning in *Cowles Media*. The primary reason that Cohen's promissory estoppel claim was allowed to proceed, as we read the decision, is that, in a promissory estoppel action, the parties are merely held to legal obligations they themselves established.[153] Conversely, a defamation claim features one party attacking the merits of another's speech and asking courts to weigh in. As the Court explained:

> Minnesota law simply requires those making promises to keep them. The parties themselves, as in this case, determine the scope of their legal obligations, and any restrictions that may be placed on the publication of truthful information are self-imposed.[154]

In our view, this reasoning explains the outcome of *Cowles Media* and is inapplicable to Cousins' tortious interference claim, which does not have the same logical distance from a defamation claim. Indeed, Cohen did not even bring a defamation claim.

In sum, *Cowles Media* stands for the unremarkable proposition that agreements formed through speech—as nearly all agreements are—are enforceable, and nondefamatory speech that causes their breach can yet be actionable. More broadly, *Cowles Media* also suggests, as discussed at length above, that causes of action implicating speech are valid as long as liability is not imposed against protected speech for no reason other than the ideas it communicates. This, of course,

---

[153] *Id*. at 671.
[154] *Id*.

is exactly what Cousins' tortious interference claim proposes, and it is not supported by *Cowles Media*.

2

The Superior Court dismissed Cousins' tortious interference claim because it was duplicative of his defamation claim: it relied on exactly the same statements, and those statements were protected by the First Amendment.[155] But the court concluded in the alternative that the claim did not allege that Goodier's singular motive was to interfere with his contract with Bayard.[156] Quoting our decision in *WaveDivision*, the court explained that "[o]nly if the defendant's *sole* motive was to interfere with the contract will this factor support a finding of improper interference."[157] Cousins argues that the court misread this passage from *WaveDivision*. We agree, but stress that Cousins' claim fails even under a proper reading of *WaveDivision*.

*WaveDivision* did not hold that a tortious interference claim requires the plaintiff to allege that the tortfeasor's "sole motive" was to interfere with the plaintiff's contract. A review of *WaveDivision*'s underlying facts and how the "motive" factor figured in our analysis will, we hope, clarify this point.

---

[155] *Cousins*, 2021 WL 3355471, at *7.
[156] *Id.*
[157] *Id.* (alteration in original) (quoting *WaveDivision*, 49 A.3d at 1174) (emphasis in cited authority).

WaveDivision had agreed to purchase cable television systems from Millennium Digital Media Systems. When certain of Millennium's creditors, who had consent rights relating to the disposition of Millennium's assets, refused to consent to Millennium's sale of the cable systems, Millennium terminated its agreement with WaveDivision and accepted an alternative deal—a refinancing proposal—with the non-consenting creditors. WaveDivision sued the creditors, alleging that they had tortiously interfered with its contract with Millennium. The Superior Court granted summary judgment in the creditors' favor, and WaveDivision appealed.

In addressing WaveDivision's tortious interference claim, we described the interplay of Sections 766 and 767 of the Restatement (Second) of Torts as they related to WaveDivision's claim. As discussed above, Section 766 defines the elements of a tortious interference claim: the plaintiff must show that the defendant knew of a contract involving the plaintiff, intentionally and improperly interfered with it, and was a significant factor in causing the contract to be breached or otherwise terminated.[158] Next, Section 767 establishes seven "factors to consider in determining if intentional interference with another's contract is improper or without justification."[159] These factors are:

> (a) the nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the actor's conduct interferes, (d) the

---

[158] *WaveDivision*, 49 A.3d at 1174 (citing *Irwin & Leighton, Inc.*, 532 A.2d at 992); *ASDI*, 11 A.3d at 751 (breach of contract not required for claim of tortious interference).
[159] *WaveDivision*, 49 A.3d at 1174.

interests sought to be advanced by the actor, (e) the social interests in protecting the freedom of action of the actor and the contractual interests of the other, (f) the proximity or remoteness of the actor's conduct to the interference, and (g) the relations between the parties.[160]

Thus, the alleged tortfeasor's motive is one factor to be weighed in determining whether the improper interference element of a tortious interference claim has been shown. As we explained:

> [t]he defense of justification does not require that the defendant's proper motive be its sole or even its predominate motive for interfering with the contract. Only if the defendant's *sole* motive was to interfere with the contract will *this factor* support a finding of improper interference.[161]

Consistently with the above, our *WaveDivision* decision described why summary judgment against WaveDivision, and in favor of Millennium's creditors, was appropriate under Sections 766 and 767. We held that, because the creditors "were motivated at least in part by a desire to protect their investment in Millennium," the motive factor—again, one of seven considerations under Section 767—"weigh[ed] in favor of justification" and therefore against liability.[162]

But this did not end our analysis. Instead, we turned to WaveDivision's argument that, even in the absence of an improper motive, the creditors used improper means—fraud and the improper use of inside information—to interfere with the contract. After rejecting this separate contention, we upheld the grant of

---

[160] *Id.* (footnotes omitted).
[161] *Id.* (emphasis added).
[162] *Id.*

46

summary judgment as an appropriate balancing of Section 767's "justification"

factors:

> [t]he Superior Court concluded that *four of the seven Restatement factors*—the nature of the actor's conduct; the actor's motive; the interests sought to be advanced by the actor; and the relations between the parties—weighed against a finding of improper interference . . . Wave has failed to show as a matter of law that the Appellees interfered with the Wave-Millennium contract without justification.[163]

Viewed in this context, *WaveDivision* should not be understood as absolutely

precluding a tortious interference claim when the alleged tortfeasor can identify one

proper motive among many unseemly ones. Motive, even after *WaveDivision*, is

simply one of seven factors to be considered when determining whether interference

was improper. In this case, however, consideration of each factor is unnecessary

because Cousins bases his tortious interference claim solely on speech that is

protected by the First Amendment. Hence, the Superior Court was right to dismiss

this claim.

V

Throughout these proceedings, both in the Superior Court and in this Court,

Cousins has passionately insisted that the positions he took in the Unionville Lawsuit

were well-intentioned and tolerant. He also points up that his participation in the

lawsuit was a protected exercise of his First Amendment rights—a fact that no one,

---

[163] *Id*. at 1175 (emphasis added).

least of all this Court, contests. But Cousins' choice to lead the charge on one side of a controversial and sensitive public debate carried with it the predictable consequence that others of a different mind would exercise their own First Amendment rights in opposition.

We offer no opinion on the merits of the controversy underlying the Unionville Lawsuit. Nor do we pass judgment on the civility of the means Goodier chose to air her grievance about the lawsuit. Our concern here is limited to whether her response gives rise to actionable state tort claims in light of the Free Speech Clause of the First Amendment. We hold that it does not and therefore affirm the judgment of the Superior Court.